788 A.2d 888 (2002)
347 N.J. Super. 44
DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Appellant,
v.
ROBERT M. and Brenda M., Defendants-Respondents,
In the Matter of Robert M., Jr., Richard M., Raymond M., Jonathan M., James M., and Jeziah M., Minors.
Superior Court of New Jersey, Appellate Division.
Submitted September 17, 2001.
Decided January 24, 2002.
*889 John J. Farmer, Jr., Attorney General, for appellant (Michael J. Haas, Assistant Attorney General, of counsel; Lisa B. Landsman, Deputy Attorney General, on the brief).
Arthur J. Russo, Phillipsburg, for respondent; Robert M., Broscious, Glynn & Fischer, attorneys for respondent Brenda M. (Mr. Russo and James W. Broscious, on the joint brief).
Harold J. Bush, Law Guardian for minor Robert M.
Vincent J. Gaughan, Law Guardian for minor Richard M.
Deborah Berk, Assistant Deputy Public Defender, Law Guardian for minors Raymond M. and Jonathan M.
Deborah Toth O'Donnell, Law Guardian for minors James M. and Jeziah M.
Before Judges STERN, EICHEN and COLLESTER.
The opinion of the court was delivered by COLLESTER, J.A.D.
Pursuant to leave granted, plaintiff, the New Jersey Division of Youth and Family Services (Division), appeals from a fact-finding order of the Hunterdon County Family Part on July 8, 2001, dismissing its complaint for continuing custody of four children of defendants, Robert M. and Brenda M., on grounds that the Division failed to prove abuse or neglect under N.J.S.A. 9:6-8.21 et seq.[1] We granted and extended a stay following the filing of a notice of appeal by the Division.
Defendants have four natural sons: Robert, Jr., born February 13, 1984, Richard, born September 23, 1985, Raymond, *890 born October 24, 1991, and Jonathan, born February 11, 1992. The family is deeply religious and closely bonded. The children were home schooled by their mother until recent years and attended church services faithfully with their parents. Mr. M. works as a motor vehicle mechanic manager in a local business. Mrs. M. is a homemaker. They lived in their own home, a four bedroom ranch in Union Township, Hunterdon County.
After attending a church meeting in 1998, defendants decided that it was their Christian duty to adopt an impoverished child from a foreign country. They first sought adoption of a child in Brazil but were unsuccessful. Through a lawyer they arranged for an adoption agency to perform a home study preparatory to placement of a child. In the fall of 1999 they were contacted by the agency and told that four year old twins at an orphanage in Siberia were available for adoption. Defendants went to Russia and discovered the twins had a brother in another orphanage. They adopted all three children in Russia on December 16, 1999. They renamed the twins James and Jeziah. Their six year old brother was named Viktor.
Defendants returned to New Jersey shortly before Christmas 1999, with their three adopted sons to form a new family of nine. Mrs. M. said the three new children were malnourished and ate "veraciously... anything they could get their hands on because perhaps the children had the feeling that food would not be there the next day." Viktor was the worst in appearance, looking "Ethiopian". He ate so much that Mrs. M. had to limit his intake at each meal so that he would not overeat. He also rejected affection. He would not hug and became stiff as a board when someone tried to hug him. Mrs. M. began giving him a baby bottle so that he would snuggle on her lap. He was also prone to temper tantrums when he would flail and lash out at others.
Viktor's main problem was his dysfunctional sleep pattern. He would lie in bed, picking at his finger or feet or playing with his mouth. He would try to wake up his brothers and at times would roam the house. In order to stop him from disturbing other family members, Mrs. M. put a mesh net over his crib. She felt that at times Viktor would "get even with her" for keeping him in his "cage" by purposely wetting or soiling and waking her to change linens in the middle of the night. There were times when she was only able to sleep two to three hours a night.
Viktor and his brothers were seen for physical examinations, immunizations and medical care by Dr. John Eck, defendants' family doctor, and his wife, Dr. Anita Eck, an internist. Both were members of defendants' church and were so impressed that defendants had given a home to the Russian children that they did not charge for office visits. The children were seen on December 29, 1999, a few days after their arrival, and twice more in June 2000. At no time did either Dr. Eck see evidence of fractures, bruises or unusual scratches on Viktor, and they were never told of any self-mutilation. What was reported was Viktor's insomnia and bed-wetting. Defendants were given samples of three different antidepressant medications to alleviate those problems.
The weekend of October 29 and 30, 2000, were momentous in the short life of Viktor M. According to Mrs. M.'s statement, he was wakeful in the middle of Saturday night and soiled himself in his bed. After he was showered, he was shivering. Mrs. M. was concerned and stayed with him Sunday morning while the rest of the family went to church. She gave the Division worker the following narrative of that morning:

*891 Mrs. M. said that on 10/28/00 (this past Saturday) she did not think Viktor's behavior was unusual although he had seemed limp and lethargic but that on Sunday 10/29/00 "it was different." She said that his eyes looked different and that he was not getting better so she decided that as soon as her husband got back from Church they would take him to the doctor. This would be around 12:00 or 12:30 p.m. She indicated then that she gave him his bath, changed him, wrapped him up and he seemed fine and then she sat him in the chair with her and cuddled him and gave him a bottle. She said very sadly that he fought her and that he stiffened his legs and clenched his teeth so hard that she couldn't open his mouth. She said that she then tried to dribble food in his mouth so that would taste the food and open his mouth but it did not work and she then realized he was unresponsive. She began tapping on his head but realized he was just staring and not responding. She indicated that on 10/29/00 Viktor had awakened her at around 2:00 or 3:00 a.m. Viktor laid in his bed and grunted. She said that that is what he usually does and that if he really wanted attention he would stand in the corner and scream until someone came. She indicated adamantly that she had no idea what happened on 10/29/00, only that "the sparkle left his eyes."
At 12:19 p.m. Mrs. M. called 9-1-1. Minutes later emergency medical technicians arrived while Mrs. M. was giving Viktor CPR. The EMT personnel reported Viktor was cold and not breathing. They intubated him, initiated ventilation, administered epinephrine and rushed him to Hunterdon Medical Center. On arrival his rectal temperature was markedly hypothermic at 83.2 degrees. His eyes were fixed and dilated. No pulse was found. He could not breathe spontaneously. His white and red blood counts indicated severe anemia.
Viktor was transported by helicopter that afternoon to the Pediatric Intensive Care Unit at Robert Wood Johnson University Hospital. His condition remained critical. His body temperature was 80 degrees Fahrenheit. He had no neurological response. His eyes remained fixed and dilated. He was in septic shock with fluid in his lungs. A radiological review showed a total shutdown of kidney function as a result of the severe prolonged anoxia suffered during cardiopulmonary arrest. A medical order was issued stating "Do Not Resuscitate."
The following day, October 30, 2000, the Division Special Response Unit was notified that Viktor was at the hospital in critical condition with suspicious injuries consisting of cuts and extensive bruising on his legs, knees, arms, hands and forehead. Caseworker Christine Baxevane responded and spoke with defendants. When asked about the cuts and bruises, both said that they were the result of self-mutilation by Viktor. The other six children were examined on that date and found to be in good health.
Viktor M. died on October 31, 2000. He was not yet seven years old. He had been in the United States for ten months.
An autopsy was performed the following day by Dr. Carlos A. Fonseca, Hunterdon County Medical Examiner. Among his findings were lesions on Viktor's back, abrasions in the area of his spine as well as his right elbow, right wrist, right index finger and swelling on the back of the right hand. Dr. Fonseca also found abrasions on the left elbow, swelling at the back of the left hand, and puncture marks on the right forearm. Irregular abrasions were noted on the left kneecap, and bruising on the left leg. Viktor's stomach was *892 partially distended. The cause of death was listed as "undetermined pending further studies."
As a result of Viktor's death, a Medical and Fatality Report was prepared by Dr. Susan Hodgson, Medical Co-Director of the Child Protection Center of the New Jersey Central Abuse Center, and was submitted on November 8, 2000, to the Division and the Hunterdon County Prosecutor's Office. The report set forth the following physical findings suggestive of physical abuse.
[H]is scalp, chin, back, elbows, hands, knees, lower legs and feet (including the soles of his feet) were covered with round and linear scabbed scratches. His scalp, elbows, knees, skin, and the backs of both hands, and his sacrum, buttocks, and hips were covered with fresh and old bruises. He had a healing (approximately 2 weeks old) buckle fracture of the proximal end of his left 4th proximal phalanges on the left hand; he had 3 uncalloused (less than 7 days old) buckle fractures of the proximal ends of his right index finger, 4th and 5th proximal phalanges on his right hand. He had signs of early cellulitis around the scabbed scratch marks on the lateral side of his left foot. He had fresh blood (hemotympanum) behind his right eardrum. He had significant swelling and bluish fresh bruising over his right hand fingers, dorsum of his right hand and extending to the dorsal right wrist. He had extensive fresh bruising on his left calf and petechiae and fresh bruising over the left skin and left lateral leg. The fresh bruising and swelling of the dorsum of the right hand suggests that the fractures in his right hand may have occurred within 48-72 hours prior to his hospitalization at Robert Wood Johnson University Hospital Pediatric Intensive care Unit on 10/29/00.
The report cast doubt on defendants' explanation of the injuries as self-inflicted.
His parents' "explanation" for all these skin findings, even the scratches and scabbed marks on the back, were due to "self-mutilation." His parents could offer no explanation for the fresh bruising on his right hand, nor for the underlying fractures in his hands. Nor could they account for the extensive diffuse bruising over his sacrum and hips.

....
The extent and location of his skin findings was truly horrifying. While some of the scabs and scratches might be the result of self-mutilation, the Child Protection Center staff who have discussed and reviewed this case feel that many of the scratches and the bruising on his back and the fractures of different ages in both hands may have been inflicted upon Viktor.
Dr. Hodgson considered medical neglect to be a contributing factor to the child's death.
Viktor's parents sought no medical attention for his skin wounds. They sought no attention for his fractures.

....
Viktor's parents sought no medical or pediatric psychiatric evaluation for Viktor's clearly out of control behavior swings, alleged self injury, and sleep disorder for over four months. They never obtained a pediatric neuropsychiatric evaluation for this clearly suffering child.
Dr. Hodgson was also critical of the continued use of adult antidepressants for Viktor's sleep disturbances.
At the time of his medical visits on 6/7/00 and 6/15/00 Viktor's parents were given samples of at least three different antidepressive medicationsPaxil, Tofranil, and lastly Remeron (on 6/15/00), *893 supposedly to be given for sedation at night for his insomnia. Viktor had never received a pediatric neuropsychiatric evaluation. The choice of a trial of "antidepressants" for Viktor's sleep disorder was never based on a sound medical diagnosis. It was hoped that the sedating side effects of these classes of medication might prove helpful to Viktor's sleep dysfunction. Two of the medications which were given to Viktor's parents (Paxil and Remeron) have not been FA approved for use in children Viktor's age. Remeron is a new class of antidepressant which has never been field tested in children. How many samples of these medications were given or the schedule for treatment of length of treatment were not clear. Once Viktor's family started treating him with medications for his sleep disorder they pursued no further medical follow-up even though his behaviors markedly worsened (the alleged self-mutilation began).

....
It is possible that Viktor's parents' unsupervised persistence in the off-label use of Remeron for sedation of Viktor at night created some of Viktor's alleged self-mutilatory behaviors. One noted side effect of Remeron is pruritis or severe itching; other adverse effects may include manic or anxious behaviors, dizziness, and loss of cognitive function. It is also possible the use of Remeron may have led to Viktor's unusually low white blood count (we await microscopic autopsy evaluation of his bone marrow). (It is also possible that his prolonged anoxia by the time of his resuscitation contributed to his low blood count).
While it should have been totally clear to Viktor's parents from simply looking at Viktor's skin and behavior that this medication was not working, his parents persisted in their attempts to sedate him at night and sought no further professional or medical assistance.
On November 8, 2000, the same day that Dr. Hodgson's report was issued, defendants were arrested and charged with child endangerment. They were released on bail with the specific condition that they have no contact with their children.
On the day of their parents' arrest, the remaining children were taken to the Hunterdon County Prosecutor's Office to be interviewed. The Division was notified to be present as part of the multi-disciplinary team and to avoid multiple interviews of the children by the Division. Caseworkers Christina Baxevane and Chris Crielly did not participate in questioning but observed the interviews, which were recorded both on audio and video tapes maintained by the prosecutor's office.
After the children were placed in temporary foster care overnight, the Division filed a complaint for protective services and an order to show cause for immediate custody, care and supervision of the children. As a result physical custody was given to the paternal and maternal grandmothers. Over that weekend an agreement was reached for defendants to move into the paternal grandmother's house and the paternal grandmother into the family home so that the children could be in their home and schools. Subsequently, the four natural children were placed with the pastor of defendants' church. The adopted twins were first placed in the custody of other church members and later in foster care. Defendants were permitted unsupervised visitation with the two oldest children and supervised visitation with the others.
On the November 30, 2000 return date of the Division's order to show cause the status quo was continued with a direction that the defendants undergo psychological evaluations. Defendants then filed an order *894 to show cause for return of their children. An order was later signed for appointment of four separate law guardians to represent the children.
On December 26, 2000, Dr. Fonseca submitted his final autopsy report. He amended Viktor's death certificate to state the cause of death as cardiac arrhythmia due to hypothermia and the manner of death as homicide.
Also on December 26, 2000, a report was submitted to the Division by Dr. Michael Fiore and Margaret Pittaluga, MSW, LCSW, of the Center for Evaluation and Counseling summarizing their interviews with the four older children in connection with a risk assessment at the Division's request pursuant to the order of November 30, 2000.
The first interview was with Raymond, who said Viktor slept in a crib with a string "cage" over it so he could not get up during the night. Raymond added that sometimes his mother would put the crib in the unheated garage so that Viktor could not be heard.
Raymond also spoke about Mrs. M.'s disciplining techniques:
My mom got a five-foot whip and a cat-o-nine tails. My mom only said she was only going to use it on us. She wanted it to last for a long time. Now the leather is getting old. She didn't hit us with it. She'd only hit with her hand. All of us got hit usually on our butt. She did it nicely so we wouldn't get too hurt. She did it to make her point. We would just get red. Before all of the new brothers came over, she'd use a belt because we were tough. She didn't want the little guys would tell people in church or their preschool she hit with a belt, so I think she stopped. My mom didn't want to get in trouble from people thinking it was child abuse. She was worried we would say things to people. She said we should be careful about what we say or people would get her in trouble and we wouldn't see her for a long time. This is what she has been saying since [Viktor] died.
The oldest son, Robert, Jr., told Dr. Fiore he participated in the disciplining of the younger children at times but added that it was not "abusive or extensive." Robert, Jr. also said that his mother would put Viktor in a crib in the garage with a cover on it. At times his parents put duct tape over Viktor's mouth because he would scream when he was put in the garage. Later Viktor was taken out of the garage because "we didn't want to put heat on in the garage." He would sometimes be locked in the pump room when he misbehaved. The pump room had cinder block walls, a concrete floor, no lights, and no bed. The children described it as dirty, extremely cold, and prone to flooding.
As to other disciplining, Robert, Jr. said that Viktor would be put in cold showers when he wet his bed. He stated that his mother used the whip only to scare Viktor and that he was struck only when he threw himself in the direction of the whip.
Richard was largely unresponsive to Ms. Pittaluga's questions. He said Viktor would overeat, his table manners were awful and he ate at a separate table from the rest of the family. On one occasion Viktor was fed a diet consisting of beans and peas. His parents would sometimes set a timer, and Viktor would not be allowed a glass of water unless he finished on time.
Jonathan was more cooperative. He said that his parents told him "not to tell" because if he told the truth, they would go to jail. Regarding the disciplining of Viktor, Jonathan said:
We'd put him in a little crib like a playpen or the bathtub and he would sleep in there. We also locked him in *895 the bathroom. My dad used to use a hanger and lock him in there.
There was another lesson that if he peed in his pants, he would go in the shower with the water all the way cold. It was to teach him a lesson. That lesson was taught to the twins too. Raymond got a cold shower once for not letting the twins go to the bathroom. Sometimes [Viktor] got a bath all the way hot. It was a lesson for him to sleep. I had to watch him. He would scream. It was plain old screaming ... like "mama I want out." But we would just ignore him.
Jonathan related that James and Jeziah did not get cold showers, but they got a very cold bath on one occasion. He said his mother used a whip and a cat-o-nine tails on Viktor, James, and Jeziah, and his father used the whip on Viktor. Viktor, James, and Jeziah would be made to run in place while carrying a bat over their head if they did not go to sleep. According to Jonathan, "if they got tired, they'd get whipped or hit with the bat."
Jonathan also stated that his mother would bend fingers back and would "break their fingers if they touched their diapers." His parents would place band aids over Viktor's eyes as he was not permitted to "see the other children being good or see them eating good food." He added that his parents would tie James and Jeziah with rope when they misbehaved. At times Robert, Jr. would hit James and Jeziah and put socks in their mouths until they ate. Mrs. M. would also hit Jeziah in the head with her hand or something else.
James reported that his parents would hit Viktor with a belt and sometimes he was punished by being put into the pump room. James added that injuries observed on his own back and stomach were because his mother hit him with a belt.
The Division filed amended complaints on January 11 and January 12, 2001, alleging abuse of Viktor and the other children based in part on the November 8, 2000, interviews with the children at the Hunterdon County Prosecutor's Office and the interviews by Dr. Fiore and Ms. Pittaluga, the report of Dr. Hodgson and the final autopsy report. The fact finding hearing began on January 25, 2000, less than three months after Viktor's death and during the time that the prosecutor's investigation into the death of Viktor was still on-going.
The continued criminal investigation caused delays and problems of discovery. Because defendants had not received transcripts of the November 8, 2000, interviews at the Hunterdon County Prosecutor's Office, the trial judge ruled that Division caseworkers Baxevane and Crielly were not permitted to testify as to the statements of the children even though their notes were made available.
Similarly, the report of Dr. Fiore and Ms. Pittaluga was redacted to exclude references to the interviews of the children at the prosecutor's office, and their testimony was restricted to exclude any references to their interviews. However, Dr. Fiore was permitted to testify as to his overall assessment that Viktor was subjected to consistent physical and emotional abuse as well as neglectful parenting. He opined that the remaining children should not be returned to their parents at that time because of risk for parental physical and emotional abuse as well as potential abuse within the sibling subsystem by Robert, Jr.
Other events unfolded during the fact finding hearing which resulted in further delays and discovery problems. On February 1, 2001, Dr. Hodgson amended her report by a letter in which she concurred with Dr. Fonseca's opinions in the final autopsy report. Dr. Hodgson issued her *896 final report a month later in which she concluded:
Viktor [M] died as a result of hypothermia. His hypothermia was a perpetrated injury or punishment from cold showers, frigid baths and/or being "caged", to sleep in insufficiently heated locations. His extensive bodily bruising and abrasions were the results of physical abuse. His injuries showed multiple ages, indicating recurrent abuse. Forensic assessments of the other M. children, witnesses to Viktor's "care" and punishment, reveal "a picture of consistent physically abusive, emotionally abusive, and neglectful parenting." (Dr. M. Fiore, Forensic Assessments.) This abusive parenting resulted in the untimely death of Viktor M.
After receipt of this report, defense counsel sought leave to obtain a defense medical expert and demanded discovery of the following:
1. All autopsy photographs
2. All autopsy body diagrams
3. Any and all photographs of seized items by the Hunterdon County Prosecutor's Office from the [M.] residence
4. Any and all post-mortem x-rays
5. Complete forensic death medical investigation
6. Interim toxicology results
7. Complete record of statements of the [M.] children at the Hunterdon County Prosecutor's Office
Since some of these materials were within the exclusive control of the county prosecutor, the deputy attorney general representing the Division faxed a letter on March 16, 2001, to the first assistant prosecutor advising that she did not have the requested materials and inquiring as to whether the prosecutor would make them available. The prosecutor's response was that criminal charges were pending presentation to the Hunterdon County Grand Jury and that "my office will not provide any material obtained in the course of our criminal investigation other than through the appropriate criminal discovery process outlined in R. 3:13-3. That means, as we have said repeatedly, no pre-indictment discovery will be provided either directly to the defendants or through your office."
This response reflected the consistent position of the prosecutor. On March 13, 2001, the prosecutor obtained a protective order from the assignment judge that no member of the prosecutor's office would be required to testify in the Family Court proceeding. On March 20, 2001, the deputy attorney general filed a motion before the presiding judge of the Criminal Division for release of the transcripts by the prosecutor. The motion was rendered moot when the prosecutor's parallel criminal investigation finally culminated in the return of an indictment against defendants on March 28, 2001.
That indictment charged defendants with aggravated manslaughter in the death of Viktor, N.J.S.A. 2C:11-4a; the lesser-included offense of manslaughter, N.J.S.A. 2C:11-4b; and separate counts of criminal endangerment under N.J.S.A. 2C:24-4a alleging (1) Viktor was confined in the unheated pump room for extended periods; (2) defendants failed to provide necessary medical care for Viktor; (3) defendants inflicted excessive corporal punishment on Viktor; and (4) defendants fed him excessive quantities of uncooked, dried beans to cause him physical distress. A final count charged defendants with tampering with witnesses, N.J.S.A. 2C:29-3a(3), by inducing their children to withhold information. Defendants entered pleas of not guilty and await trial as of this writing.
Following return of the indictment, discovery of the children's statements was *897 made available under R. 3:13-3 to defense counsel who represented defendants in both the Criminal and Family Court actions. A consent order on May 25, 2001 released copies to the Division.
Discovery issues also arose with respect to autopsy materials sought by defendants for review by an expert pathologist. On March 20, 2001, the deputy attorney general wrote to Dr. Fonseca for production of the requested material. She was advised a week later that the photographs, diagrams and microscopic slides had not been located. The slides were never located. On April 18, 2001, Dr. Fonseca located autopsy diagrams, which were then faxed to defense counsel. After a set of autopsy photographs were found in the possession of the prosecutor, the deputy attorney general advised defense counsel on April 23, 2001, that they were available for inspection at the prosecutor's office. However, defense counsel demanded their own set of photographs. Subsequently, the negatives were found at the New Jersey State Police forensic laboratory. On April 27, 2001, the deputy attorney general submitted an order to expedite the production of a set of the autopsy photographs. The order was signed by the trial judge on April 30, 2001.
Two days later on May 2, 2001, the Division sought to introduce the November 8, 2000, statements of the children. The trial judge sustained defense objections and excluded the children's statements given to the prosecutor as well as witness references or opinions based on them by the Division's witnesses. Also excluded were the autopsy reports and any testimony or evidence based on the autopsy performed on Viktor including applicable portions of Dr. Hodgson's reports and her proposed testimony. The judge gave the following explanation:
I think it's time that I take the case in hand because I think it reflects badly on my ability to manage my calendar and to manage cases so that they are heard expeditiously and fairly. I see no reason for me to sit here as a potted palm, as it were, and allow this to go on in this fashion.
The division made no effort to get these records of the children's interviews from the Prosecutor's Office and in fact, perhaps, may have joined in the objection that was filed with the Presiding Judge. I don't know because I don't pay any attention. I'm trying to stay focused on what goes on in this courtroom and to absolutely ignore everything else.
But I do know I have from early days suggested to you that there will be no testimony in regard to what was said in the Prosecutor's Office without copies of those tapes. And we didn't have them when we started this. We didn't have them within a reasonable period thereafter and they are not going to be allowed now. Absolutely not.
It is beyond the pale for you to come in and suggest that this dilatoriness should be condoned by the Court by overlooking it and permitting it to be used at this stage of this overly long fact-finding hearing and it is not going to be permitted to be admitted into evidence. I will sign an order and you can appeal it. But I will not permit it. Let somebody else call that shot, but I will not. I am embarrassed to be presiding over these proceedings.
All right, what else you want to address in regard to the autopsy? It seems to me that likewise should be excluded because we do not have the necessarythe necessary documents. And I think this case will have to stand or fall on the testimony that children told the doctors during their interviews. I see no other way around this lack of *898 timelywe have standards under ASFA to move these cases.
There's no reason since DYFS was involved in this case from Day One, why this information is not before the Court months ago. I can't in good conscience suggest that this can go on open-ended forever and I can't condone that kind of dilatoriness by now permitting that information to be put into evidence in this Court. I cannot.
Defendants called as witnesses Rev. Szierer, the children's minister with whom the four natural children resided; Phyllis Eckel, their school principal; and Dr. Bruce, who was Robert's and Richard's English teacher. All testified that they had never seen any signs of abuse of these children and that they were well-adjusted children who were suffering as a result of separation from their parents. Their testimony was supported by the testimony of both Drs. Eck, who were called by the Division as witnesses. The defendants did not testify, and they called no medical expert.
On July 3, 2001, the trial judge rendered an opinion regarding Robert, Jr., Richard, Raymond and Jonathan, reserving opinion as to James and Jeziah for the law guardian to submit information as to the wishes of the five year old twins. The trial judge found by a fair preponderance of the evidence that Viktor was a neglected child within the meaning of N.J.S.A. 9:6-8.21c. No finding was made that he was an abused child. As to the consequence of this finding, the judge framed the issue as follows:
Ever since the date of the return on the order to show cause, the primary issue before this Court continues to be whether the injuries which caused Viktor's death, which by the preponderance of the evidence sustains a finding that the defendants were negligent in caring for the emotional and medical needs of Viktor, are sufficient to prove that these six remaining children are abused and neglected children.
The trial judge determined the evidence insufficient to prove that the four natural children were abused or neglected.
This Court agrees with the respective counsel that the four older boys, of the four older boys, that they do not meet the definition of abused or neglected children under any of the subparts of New Jersey Statute 9:6-8.21c. There was no evidence any one of them was inflicted with any physical injury under subsection c(1), nor was there any substantial or ongoing risk of physical injury which would likely cause death or serious protracted disfigurement under Section c(2).... None of these four children is a child whose physical, mental or emotional condition has been impaired or in imminent danger of becoming impaired as a result of the defendants['] failure to exercise a minimum degree of care and supplying any of them with adequate food, shelter, clothing, education, medical or surgical care. I note that all were doing ... well behaviorally and were diligent in their studies. And, none needed any medical care as evidenced by their physicals.
Neither did the defendants fail ... in providing any of these four children with proper supervision or guardianship by unreasonably inflicting or allowing to be inflicted harm or substantial risk thereof, including the infliction of excessive corporal punishment or by any other acts of similarly serious nature requiring the aid of the Court.
While these children clearly were raised in a strict household and were subject to corporal punishment on some occasions when they misbehaved, none of them allege that they have been subjected *899 to excessive corporal punishment. Not only do they not allege it, they exhibit no evidence to suggest the corporal punishment that any one of these four children received was excessive. None have been willfully abandoned under Subsection c(4), correction c(5), none have been subjected to excessive physical restraints under Subsection c(6) and none has been institutionalized as described under Section c(7).
The judge specifically rejected the Division's contention that defendants' treatment of Viktor impacted on the remaining children so as to mandate their continued legal custody and supervision by the Division. The judge continued:
J & E v. M & F, 157 N.J.Super. 478, 385 A.2d 240, Appellate Division case, 1978 and New Jersey Statute 9:6-8.46a(1) [state] "In any hearing under this Act, proof of the abuse or neglect of one child shall be admissible evidence on the issue of abuse of neglect of any other child." However, the Division moves beyond acknowledging this statement for what it is, a rule of evidence. Instead, the Division insists that proof of the abuse of one brother is proof of the abuse of all the others, thereby relieving it of the burden to prove specific abuse or neglect as to each child. The Division is incorrect. Nowhere in New Jersey Statute 9:6-8.9 or 9:6-8.21 is an abused or neglected child defined as "the sibling of an abused or neglected child."
In fact, New Jersey Statute 9:6-8.33(c) states, "In cases of emergency, in addition to the removal of one child, that is a child who is alleged to be abused and neglected, any other child residing within the home may also be removed if his immediate removal is necessary to avoid imminent danger to his life or health." Had the legislature intended that all children must be removed because all are deemed to be abused and neglected when one is abused and neglected, it could have said so.
Clearly, it is not the scheme of New Jersey Statute 9:6-1, et seq. to confer jurisdiction over any child simply because there are proofs supporting the jurisdiction of the Court for a sibling.

....
In the case before the Court, evidence of defendants['] fitness as to the four older boys can be gleaned from the four older boys, thus, the situation of these boys is very different from J & E versus M & F. In the first place, there is a history between the parents and each of these four children upon which to form a judgment about the quality of their care. There's no need to rely on treatment of Viktor to predict how these parents will treat these four older children in the future. For all of Robert's 17 years, Richard's 15½ years, Raymond's 10½ years and Jonathon's 9 years, the Division has not shown any parental mistreatment. There is nothing in this case, or any of the cases cited by the Division to suggest that the Division can be relieved of its burden to make the case required of it as to each of these children that it claims to be abused or neglected.
The conclusion of the trial judge was in accord with the position of the law guardian for Robert, Jr. While Richard's law guardian argued for immediate return of his client to his parents, he recommended a psychological evaluation of defendants and counseling for the family. The law guardian for Raymond and Jonathan, the younger natural siblings, asserted that there was no evidence of their abuse or neglect and that the children expressed a desire to return to their parents. However, she did not recommend reunification *900 unless there was psychological assistance for the family. The trial judge rejected these conditions for the children's return and stated that under R. 5:8A a law guardian could make no recommendation contrary to the children's wishes.
The proper role of a law guardian was also raised by the judge after the law guardian for the twins adopted the position of the Division that none of the children should be returned to the defendants. The law guardian's summation did not delineate the children's desires. The judge stated that it was inappropriate for the law guardian to suggest disposition as to the other children, and she withheld disposition as to the twins until the twins' law guardian advised the court of their wishes.[2]
On July 24, 2001, after leave to appeal was granted as to the natural children, the trial judge rendered an opinion in which she found that the adopted twins, James and Jeziah, were abused children under N.J.S.A. 9:6-8.21 by reason of excessive corporal punishment by defendants. Emphasis was placed on the statements of nine year old Jonathan to Dr. Fiore:
Jonathan also described his mother as using a belt, but he added that she used a whip and a cat-o-nine tails on the twins, and that they had to stand and run in a corner with a bat over their heads if they did not sleep, and if they got tired, they got hit with the bat. He also said his Mom bent their fingers back if they touched their diapers, causing them to say "ouch." These actions and the medical report that James had a belt mark on his left thigh on November 8, 2000, is evidence that defendants used excessive corporeal punishment on James and Jeziah, ... therefore to find that they were abused by the fair preponderance of the evidence. This finding is required since the defendants did not offer any testimony to refute this evidence of excessiveness.
In holding that the twins were abused children the trial judge also gave weight to statements concerning defendants' treatment of Viktor, but restricted the applicability of such evidence to the twins as opposed to the natural children.
[t]he treatment of Viktor is relevant to his Russian born siblings' treatment under J.& E. v. M.& F., 157 N.J.Super. 478, 385 A.2d 240 (App.Div.1978), because of the greater commonality of their circumstances. Some of the twins', particularly James', behavior patterns, while not as dysfunctional as Viktor's, were in some ways similar and they were disciplined similarly at least on some occasions. They all came into the household past toddlerhood and had habits and behaviors that did not fit those expected by these defendants, who had successfully raised four older children since birth. They were a unique challenge for which these parents were ill prepared and to which they reacted, by the fair preponderance of the evidence with excessive corporeal punishment.
The trial judge ordered continued care and custody of James and Jeziah with the Division, affording defendants supervised visitation. Defendants do not appeal from that order.
The Division appeals from dismissal of its complaint respecting the four natural children. It argues that the evidence established *901 by a preponderance of the evidence that the four children were abused or neglected within the meaning of Title 9, and, furthermore, that the exclusion of the autopsy report and the statements of the children to the prosecutor constituted reversible error. The law guardian for Raymond and Joseph, the two younger children, joins in these arguments.
We are constrained to reverse and remand for further hearing based on the wrongful exclusion of the children's statements and the autopsy report.
This case presents an unfortunate and extreme instance of conflicts and problems in Title 9 or Title 30 proceedings which can arise from the relationship between the Division and law enforcement agencies when parallel investigations are pursued. As the Chief Justice stated in State v. P.Z., 152 N.J. 86, 100, 703 A.2d 901 (1997), "the criminal justice system acts separately but in tandem with the civil system to investigate and prosecute those who abuse or neglect children." The Division is required to investigate allegations of abuse and neglect, N.J.S.A. 9:6-8.11-8.18, to ascertain their veracity, to take action to safeguard abused children from further harm, either by seeking ways to remediate such conduct or, in a proper instance, by placing the child in protective custody of the State. N.J.S.A. 9:6-8.18, -8.31, -8.35, -8.50e, -8.51, -8.58. The interest of law enforcement is different since the focus is the criminal culpability of those accused of child abuse and neglect under N.J.S.A. 2C:24-4a. State v. Demarest, 252 N.J.Super. 323, 333, 599 A.2d 937 (App. Div.1991).
The statutory scheme and administrative regulations of the Division envisage cooperation between the agency and law enforcement. N.J.A.C. 10:129-1.1(a)4. The Division is obliged to immediately report to the county prosecutor all instances of suspected criminal activity including child abuse or neglect. N.J.S.A. 9:6-8.36a; N.J.A.C. 10:129-1.1(a); -129-1.3(d), -129-1.3(e). If the Division institutes a child abuse complaint in the Family Court, a copy must be sent to the county prosecutor N.J.S.A. 9:6-8.25a. Alternatively, if the prosecutor decides to bring a criminal case, the caseworker must be advised. N.J.A.C. 10:129-1.5(c).
While the Division must maintain strict confidentiality of records and reports of child abuse, an exception requires release of such information to law enforcement agencies investigating child abuse. N.J.S.A. 9:6-8.10a, b(2). However, no statute or rule requires the county prosecutor to disclose information of an on-going criminal investigation to the Division. While Title 9 contemplates that actions brought by the Division will continue after referral to the county prosecutor, N.J.S.A. 9:6-8.24, the prosecutor is not restrained from continuing its investigation while the Title 9 action proceeds to trial.
Parallel investigations and proceedings by the Division and the county prosecutor have resulted in thorny constitutional issues. See P.Z., supra, 152 N.J. at 86, 703 A.2d 901 (defendant not entitled to Miranda warnings in a non-custodial interview with a Division caseworker); State v. Helewa, 223 N.J.Super. 40, 537 A.2d 1328 (App.Div.1988) (Miranda rule applicable when defendant interviewed by caseworker in jail); accord, State v. Flower, 224 N.J.Super. 208, 539 A.2d 1284 (Law Div.), aff'd, 224 N.J.Super. 90, 539 A.2d 1223 (App.Div.1988). Defendants may face the Hobson's choice of deciding whether to testify and risk incrimination or remain silent in the face of testimony that could deprive them of custody of their children. Judges must be mindful of the potential for abuse of defendant's civil or *902 criminal procedural rights. However, the fact of parallel proceedings does not invest a defendant with any additional procedural safeguards beyond those provided by constitution, statute or procedural rules. P.Z., supra, 152 N.J. at 117, 703 A.2d 901.
The applicable discovery rule, R. 5:12-3, mandates that
All relevant reports of the Division of Youth and Family Services and other reports of experts or other documents upon which the Division intends to rely shall be provided to the court and to counsel for all parties on the first return date of the Order to Show Cause, if then available, or as soon as practicable after they become available.

(Emphasis supplied.)
The transcripts of the interviews of the children by members of the prosecutor's office were not made available to the Division until after the return of the indictment, the same time they were available to defendants under the rules of criminal practice.[3] Since the indictment was returned on March 28, 2000, and the same attorneys have represented defendants in the civil and criminal proceedings, the discovery sought from the Division was available to defendants some weeks before the trial judge excluded the proffered evidence based on the perceived failure of the Division to comply with R. 5:12-3. Furthermore, the substance of the children's statements were known by defendants since the inception of the action through the caseworker's notes, and the autopsy reports were available early on.
We have carefully reviewed the lengthy record of this case and find no misconduct or tactical delay by the Division or the deputy attorney general representing the Division. Contrary to the allegations of defense counsel and some comments of the trial judge, the record indicates a good faith effort by the Division to comply with discovery obligations. The Division was rebuffed by the prosecutor in its efforts to obtain the tapes or transcripts of the children's interviews prior to indictment of defendants, and the Division made proper request of the county medical examiner, the prosecutor and the State police for all autopsy material including negatives of autopsy pictures. No plausible inference can be drawn that the Division conspired with the Hunterdon County Prosecutor to manipulate the process to wrongfully deprive defendants of necessary discovery. Compare State v. Kobrin Securities, Inc., 111 N.J. 307, 317, 544 A.2d 833 (1988). This is not one of the rare instances where governmental actions violate "commonly accepted standards of decency of conduct to which government must adhere." State v. Talbot, 71 N.J. 160, 168, 364 A.2d 9 (1976). The actions of the Division did not deprive defendants of "fundamental fairness." Compare State v. Sugar, 84 N.J. 1, 417 A.2d 474 (1980); see also Doe v. Poritz, 142 N.J. 1, 108, 662 A.2d 367 (1995).
We do not mean to suggest that defendants were not entitled to timely receipt of pertinent discovery and appropriate time to secure witnesses to challenge the statements and opinions submitted. We understand the reluctance of the trial judge to grant further adjournments in this lengthy and contentious proceeding.[4] It is for *903 good reason that cases of this nature are given priority. The well-being of children and the family structure are in issue. "Justice delayed is justice denied" is not a simple platitude. It imports a realistic concern, especially where the welfare and safety of children are concerned.
However, in this instance the trial judge wrongfully excluded potentially critical evidence and turned a blind eye to what was known by all involved in this proceeding that Viktor's death was officially determined a homicide, that the Division's medical expert attributed his death to abuse by defendants and that statements of the other children could corroborate abuse. Facts do not disappear because they are ignored. The exclusionary ruling of the trial judge eviscerated the Division's thesis that Viktor died as a result of serious abuse by defendants and that the other children were in turn abused by virtue of being exposed to cruel and abusive treatment of Viktor. The ruling also straight-jacketed and confined the decision of the trial judge to consideration only as to emotional or medical neglect of Viktor and not of abuse which may have culminated in his death.
The trial judge concluded:
Because the State failed to supply in this court all the records and materials that were utilized in arriving at the autopsy report, this court does not know the official findings as to the cause of Viktor's death, nor did defendants have the materials to challenge whatever findings were made as to the cause of death. This court is, thus, left with Dr. Hodgson's opinion from her report that "emotional and medical neglect contributed to his untimely death." No other persons were involved in Viktor's care for any extent for the three and a half months between his last visit to Dr. Eck and his lapsing into a coma on October 29th, 2000.
Dr. Hodgson's opinion as to his neglect, I find constitutes prima facie evidence that the parents subjected him to neglect. In accordance with New Jersey Division of Youth and Family Services versus SS, 175 [275] N.J. Super[.], 173, [645 A.2d 1213 (App.Div.1994)], Page 81, Appellate Division decision of 1994, the burden thus shifts to the parents to exculpate themselves. However, they presented no evidence to refute the prima facie evidence other than by self-mutilization, other than by the explanation of self-mutilization which Dr. Hodgson ruled out as the explanation for all the various significant injuries to Viktor. Therefore, I find that by the fair preponderance of the credible evidence, that it supports a finding that Viktor [M] was a neglected child.
There is a qualitative and dramatic difference between a case in which it is alleged that a child's death resulted from neglectful conduct by negligent or incompetent parents and one in which it is charged that a child died as a result of physical abuse tantamount to torture. It was error for the trial judge to restrict her findings as to parental neglect of Viktor and exclude relevant proof of parental abuse which could be considered on the question of past or potential abuse of the other children.
As previously noted, the trial judge concluded that the alleged treatment of Viktor by defendants did not impact upon their four natural children for the following reasons:
In the case before the Court, evidence of defendants' fitness as to the other four older boys, thus, the situation of these boys is very different from J & R versus M & F. In the first place, there is a history between the parents and each of *904 these four children upon which to form a judgment about the quality of their care. There's no need to rely on the treatment of Viktor to predict how these parents will treat these four older children in the future. For all of Robert's 17 years, Richard's 15½ years, Raymond's 10½ years and Jonathan's 9 years, the Division has not shown any parental mistreatment.
Although the absence of past physical abuse to the natural children may infer their future safety, the alleged treatment of Viktor could be a dangerous harbinger to one or more of the others. As we stated in J.& E. v. M.& F., 157 N.J.Super. 478, 493, 385 A.2d 240 (App.Div.), certif. denied, 77 N.J. 490, 391 A.2d 504 (1978).
Predictions as to probable future conduct can only be based upon past performance.... We cannot conceive that the Legislature intended to guarantee parents at least one chance to kill or abuse each child. Evidence of parents' fitness or unfitness can be gleaned not only [from] their past treatment of the child in question but also from the quality of care given to other children in their custody.
A child's exposure to a parent's physical abuse of a child may well be abusive to others by instilling either fear or a tolerance to violence in intra-family relationships. In the instant case the trial judge found that the twins, James and Jeziah, were abused children partly because of defendants' treatment of Viktor. If Viktor was abused by defendants and died as a result, potential abuse of other children, whether emotional or physical, cannot be discounted.
In evaluating the whole picture each part cannot be separately determined. In child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the children. One act may be "substantial" or the sum of many acts may be "substantial." New Jersey Div. Of Youth and Family Services v. C.M. 181 N.J.Super. 190, 201, 436 A.2d 1158 (App.Div.1981).
We hold the exclusion of the children's statements as well as the autopsy reports and related opinions constituted an improper exercise of discretion amounting to reversible error. We reverse the dismissal of the complaint and remand for further hearing and consideration of the proffered evidence.
We further find it necessary to comment on the different views of some counsel and the trial judge respecting the proper role of a law guardian. N.J.S.A. 9:6-8.23 specifies that
Any minor who is the subject of a child abuse or neglect proceeding under this act must be represented by a law guardian to help protect his interests and to help him express his wishes to the court.
The rules of court distinguish between a law guardian and a guardian ad litem. R. 5:8A specifies that in actions involving custody or visitation the court may appoint counsel on behalf of the child or children. R. 5:8B provides for appointment of a guardian ad litem "to represent the best interests of a child or children" and requires the filing of a written report and availability to testify and be subject to cross-examination. The Official Comments for Rules 5:8A and 5:8B clarify the distinction:
A court-appointed counsel's services are to the child. Counsel acts as an independent legal advocate for the best interests of the child and takes an active part in the hearing, ranging from subpoenaing and cross-examining witnesses to appealing the decision, if warranted. If the purpose of the appointment is for *905 legal advocacy, then counsel would be appointed.
A court-appointed guardian ad litem's services are to the court on behalf of the child. The GAL acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child. The GAL submits a written report to the court and is available to testify. If the purpose of the appointment is for independent investigation and fact finding, then a GAL would be appointed. The GAL can be an attorney, a social worker, a mental health professional or other appropriate person. If the primary function of the GAL is to act in the capacity of an expert, then the court should ordinarily appoint a GAL from the appropriate area of expertise. Attorneys acting on behalf of children in abuse or neglect cases and in termination of parental rights cases should act as counsel for the child pursuant to Rule 5:8A rather than in the capacity of a GAL pursuant to Rule 5:8B.
The comments follow the rationale of Matter of M.R., 135 N.J. 155, 638 A.2d 1274 (1994), which considered the advocacy rule of the attorney for an incompetent. The Supreme Court speaking through Justice Pollock distinguished a representative attorney from a guardian ad litem by citing with approval the distinction made in a 1994 report of the Family Practice Committee:
The Committee firmly believes that the role of an attorney in abuse or neglect cases and in termination of parental rights cases must be as an advocate for the child. Nothing short of zealous representation is adequate to protect a child's fundamental legal rights....
Requiring attorneys to act as counsel for children in these cases, does not deprive the court of the benefit of the type of assistance afforded by a guardian ad litem. Clearly, as counsel for the child, an attorney could request the additional appointment of a guardian ad litem, and the court sua sponte could do so if deemed necessary. Yet by clarifying an attorney's role as counsel for the child, substantial evidentiary and procedural dilemmas could be solved. Under the present situation where attorneys assume a hybrid role of attorney/social investigator, questions arise such as the right of the attorney to speak with the parties outside the presence of their counsel; whether communications between a child and the attorney are privileged; and whether an attorney who submits an investigative report is subject to cross-examination. Finally, having attorneys acts as counsel for children insures that they are being utilized for a role for which they are trained and suited.
[Family Division Practice Committee Report (1994), quoted in Matter of M.R., supra, 135 N.J. at 174-75, 638 A.2d 1274.]
We made the same distinction in Matter of Adoption of a child by E.T., 302 N.J.Super. 533, 539, 695 A.2d 734 (App.Div.1997):
There is, of course, a distinct difference between a law guardian as provided for by R. 5:8A who must be all attorneys-at-law, and a guardian ad litem as provided for in R. 5:8B, who need not be an attorney-at-law. In sum, the basic role of a law guardian for an incompetent, or a minor is to "zealously advocate the client's cause" whereas the basic role of a guardian ad litem is to assist the court in its determination of the incompetent's or minor's best interest.
During oral argument, one of the law guardians remarked that the wishes of children are dreams. True. But the judge entrusted with these difficult and often *906 heart-rendering decisions must be advised of a child's wishes if justice is to be done. Law guardians are obliged to make the wishes of their clients known, to make recommendations as to how a child client's desires may best be accomplished, to express any concerns regarding the child's safety or well-being and in a proper case to suggest the appointment of a guardian ad litem.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] Leave to appeal was required because the Division's complaint was still viable at that time with regard to the defendants' two adopted children.
[2] The trial judge directed that the law guardian advise her of the twins' desires within two days or face possible removal and appointment of a substitute law guardian. After the law guardian addressed a letter to the judge setting forth her legal position, the judge proceeded to decide the matter without appointment of a substitute guardian.
[3] R. 3:13-3(b) mandates that the prosecutor's discovery be made available within fourteen days of indictment, and subsection 3(c) permits a defendant to "inspect and copy or photograph" relevant material.
[4] On more than one occasion counsel for defendants made formal application for incarceration of the deputy attorney general representing the Division. All were summarily rejected by the trial judge.