# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3488-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

 Plaintiff-Respondent,

v.

S.S.,

 Defendant,

and

P.F.,

 Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.F., a minor.

_____

Submitted April 23, 2024 – Decided July 5, 2024

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0007-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Steven Edward Miklosey, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Following a five-day Title 30 guardianship trial, Judge Mary Ann O'Brien terminated the parental rights of S.S. (Sarah)[1] and P.F. (Phil) to their then two-year-old, son J.F. (Jordan). The termination arose from the neglect and abuse Phil and Sarah inflicted on Jordan's older maternal half-brother, C.M. (Chris). Phil appeals, only challenging the judge's findings as to prongs two and four of the best interest test governing the termination of parental rights and

---

[1] We use pseudonyms or initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d).

permanency under N.J.S.A. 30:4C-15.1(a).[2]  The Division of Child Protection and Permanency (Division) and Law Guardian urge us to uphold the decision. Because the judge's order is consistent with the law, we affirm.

I

In late August 2021, the Division received a referral through the Screening and Crisis Intervention Program (SCIP) from Legacy Treatment Services regarding alleged mistreatment of Chris.  A nurse reported that during a virtual visit, the eight-year-old Chris had "extreme bruising on his face," appeared "malnourished," had "withdrawn" cheeks, and "his forehead looked like it was protruding."  The nurse noted Chris' conflicting statements regarding how his injuries were sustained.  He said that his "mommy and daddy beat [him]," but also that "he had done th[o]se things to himself, and that he hates his parent[s] and wants them to get in trouble."  Sarah and Phil, who is not Chris' biological father but had been living with Sarah and Chris since February 2020, were present during the virtual visit.[3]  They showed the nurse videos of Chris' room, claiming "he used his 'face'" to make "huge holes" in his wall.  They also told the nurse they fed Chris, but that "he 'throws it up' . . . 'hides the food in the

---

[2]  Sarah has not challenged the judge's ruling and is not a party to this appeal.

[3]  Chris' biological father died in 2019.

3

walls' and does not eat it." Notwithstanding the conflicting allegations how Chris' body was "traumatized," he was "sent to the hospital . . . due to malnourishment and extreme bruising on his face."

When EMTs arrived at the home, Chris was found crouched in the closet of his dark, unfurnished room with huge purple rings around his eyes, thinning hair, a sunken face, and a protruding forehead. Whereas Jordan was found free of injuries and of average health for his age. Within hours of the referral, the Division removed Jordan and Chris from the home. Three months later, in November 2021, Phil was arrested and charged with second degree endangering the welfare of a child, N.J.S.A. 2C:24-4, and fourth-degree neglect, N.J.S.A. 9:6-3.

The Division filed a complaint for custody of Jordan and care and supervision of Chris based on allegations that Sarah and Phil abused and neglected the boys.[4] On August 31, 2021, the Division was granted the relief it sought.

On October 14, 2022, after a fact-finding hearing, Judge O'Brien determined Sarah and Phil subjected Chris to abuse and neglect and, as a result,

_____

[4] Sarah surrendered her parental rights to Chris to his resource parents on May 5, 2023.

placed Jordan at imminent risk of harm. The judge also approved the Division's permanency plan of termination of Phil and Sarah's parental rights, followed by his current resource parents' adoption.

Jordan was placed with his current resource parents on November 28, 2022. He remained there until the guardianship trial concluded, awaiting his adoption.

During the guardianship trial, conducted throughout May and June 2023, the Division presented the testimony of six witnesses: two Division staff members, a Pemberton Township Police detective, a Burlington County Prosecutor's Office detective, Maria McColgan, M.D. — an expert child abuse pediatrician, and Brian Eig, Psy.D. — an expert clinical and forensic psychologist. The Law Guardian presented the testimony of James Loving, Psy.D., an expert clinical and forensic psychologist. Neither Sarah nor Phil testified. Phil presented the testimony of his mother.

Following the trial, Judge O'Brien reserved decision. On June 28, 2023, the judge rendered a bench decision covering 151 transcript pages, terminating Sarah's and Phil's parental rights to Jordan. The judge awarded guardianship of Jordan to the Division, allowing them to consent to his adoption.

A-3488-22

## II

In reviewing a family court's decision to terminate parental rights, we give "deference to the . . . court[s'] fact[-]finding" because of "the family courts' special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). The judge's findings of fact are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Judge O'Brien carefully reviewed the evidence presented, concluding the Division met, by clear and convincing evidence, all the legal requirements to sustain a judgment of guardianship. Her oral decision tracks the four prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a); accords with our high court's prior holdings in In re Guardianship of K.H.O., 161 N.J. 337 (1999), In re Guardianship of D.M.H., 161 N.J. 365 (1999), and N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420 (2012); and is supported by substantial and credible evidence in the record. We, therefore, affirm substantially on the grounds

6

expressed in the judge's thorough and well-reasoned decision.  We highlight the judge's analysis of prongs two and four, the only rulings Phil challenges.

A.  Prong Two

Under prong two, the Division must prove "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm."  N.J.S.A. 30:4C-15.1(a)(2).[5]

"The second prong of the statutory standard relates to parental unfitness." K.H.O., 161 N.J. 337 at 352.  The prong requires a judge to consider whether it is reasonably foreseeable that a parent could "cease to inflict harm upon" a child entrusted to them.  N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 607 (1986).  In satisfying the prong's evidentiary burden, the Division may demonstrate how a parent is unable to:  (1) "provide 'a safe and stable home for the child' and a 'delay in permanent placement' will further the harm to the child," K.H.O., 161 N.J. 337 at 352  (quoting N.J.S.A. 30:4C-15.1(a)(2)); or (2)

---

[5]  On July 2, 2021, the Legislature enacted L. 2021 c. 154, § 9 amending N.J.S.A. 30:4C-15.1(a) pertaining to the standards for terminating parental rights. Specifically, the Legislature amended N.J.S.A. 30:4C-15.1(a)(2), to exclude the second sentence of (a)(2), which read:  "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child."

cure the initial cause of harm and will continue to cause serious and lasting harm for the child, In re Guardianship of J.C., 129 N.J. 1, 10 (1992). The judge may consider a parent's: (1) past behavior because past harm can be predictive of future abuse or neglect of another child, see J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978), and a child's mere "exposure to a parent's physical abuse of a child may well be abusive to" other children, see N.J. Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002); and (2) "delay in [securing] permanent placement" for the child because a delay is a harm in itself, K.H.O., 161 N.J. at 352-54.

Phil argues there was no credible evidence that he harmed Chris. He specifically argues the judge erroneously "place[d] great importance upon Chris' accusations of abuse and Dr. McColgan's conclusion that many of Chris' injuries were not consistent with self-harm." Because of the pending crimnal charges against him, he claims "it made little sense to make any significant changes in [his and Sarah's] residency or seek permanent employment until their own futures became clear." He emphasizes, any

> allegations of harm to Jordan were never raised as a concern by [the Division] or medical professionals[;] that [he and Sarah] consistently participated in visitation[s] with Jordan throughout their case[] [and] that they were compliant in managing and eliminating their prior substance abuse[;] and that they had valid

concerns for not completing psychological evaluations earlier in litigation.

Moreover, he maintains there is no proof that he could not be trusted with caring for Jordan.

The judge properly determined the Division established that Phil abused Chris, which negatively impacted his ability and willingness to maintain and foster "an environment leading to normal child development" for Jordan. Robert M., 347 N.J. Super. at 68. In Robert M., this court reversed the trial court's finding that the defendants' four older biological sons were not abused because "[a]lthough the absence of past physical abuse to the [defendants'] natural children may [have] infer[ed] their future safety, the alleged treatment of [their adopted child] could be a dangerous harbinger to one or more of the other[]" adoptive or biological children. Ibid. One of the defendants' three adopted sons, who died, was subjected to more frequent and severe discipline than his other siblings—daily cold showers, forced to sleep in an unheated garage with duct tape over his mouth, locked in a cinder block room, and overly-medicated. Id. at 54-55. The other six siblings often witnessed the defendants' treatment of the abused child. Id. at 56.

The record discloses Sarah allowed and fostered a parent-like relationship between Chris and Phil; Phil lived with Chris for a little over a year and made

many disciplinary and health-related decisions concerning Chris, who called Phil "daddy." The judge properly considered the effect on Jordan of Phil's maltreatment of Chris—locking Chris is a dark and unfurnished room with little to no food, subjecting Chris to constant near-death abuse and neglect.

Furthermore, Drs. Eig and Loving both testified that Phil's prognosis for change was extremely poor, considering his refusal to take any genuine responsibility for parenting flaws, opining that even if his pending criminal charges were not preventing his full compliance with services, they could not expect any long-term changes in his behavior. The unlikelihood of Phil showing any long-term change was further exemplified by his psychological stressors and environmental circumstances — to which Dr. Eig testified had not changed or improved since Jordan's removal up to the time of trial — lack of employment and only source of income being welfare, living in a motel with no effort to attain a more permanent living arrangement, and pending criminal charges for abusing Chris.

Accordingly, there was clear and convincing evidence to support the judge's finding the Division proved prong two that Phil's continued parental relationship with Jordan would be harmed given his abuse of Chris.

A-3488-22

B. Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The prong characterizes a child's need for permanency as "an important consideration." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). "The question to be addressed under [the] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [their] foster parents." K.H.O., 161 N.J. at 355. The "prong serves as a fail-safe against termination even where the remaining standards have been met," and "does not provide an independent basis for termination where the other standards have not been satisfied." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007).

To weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on "the strength of each relationship." J.C., 129 N.J. at 25. "[W]here it is shown that the bond with foster parents is strong and, in comparison, the

11

bond with the natural parent is not as strong, that evidence will satisfy the requirement of N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

Phil contends that Drs. Eig and Loving both determined there was a secure and strong attachment between him and Jordan. He stressed that Dr. Eig reported that "Jordan would be at high risk of severe and enduring psychological or emotional harm if his relationship with [Phil] was permanently ended." On the other hand, according to Phil, Dr. Loving "was more conservative and somewhat vague in his assessment of the risk that faced Jordan, acknow[l]edging that Jordan would suffer short-term problems adjusting to the sudden loss of contact with his parents." Phil contends the fact that Jordan "was acting out and presenting behavioral problems" during the months the resource parents' cared for him preceding the trial's end, conflicts with the judge's finding "that the resource [parents] could mitigate the harm of a sudden loss of both of Jordan's parents, to whom he was securely attached." Finally, he emphasizes he "had little choice but to defer psychological evaluations while [his] criminal proceedings progressed."

Phil's contentions fail to overcome the cogent reasons explained by Judge O'Brien in finding the Division satisfied its prong four burden. Relying upon the unrebutted conclusions of Drs. Eig and Loving, the judge considered the

psychological effect termination versus reunification would have on Jordan, ultimately adopting their opinions that reunification would do greater harm to Jordan than termination of his natural parent's rights. Essentially, the judge concluded as the court did in K.H.O., that Phil "is [neither currently] capable of being a parent, [as he] has provided no reliable indication, despite some apparent [compliance with some—not all—of his court ordered services], [nor] that []he [would] ever be in the foreseeable future." 161 N.J. 356-57.

The record shows that while Jordan did have an adjustment period transitioning to the resource parents, he made significant progress under their care. The Division did not act prematurely in seeking termination of Phil's parental rights because his criminal charges were still pending. Considering Jordan's pressing need for a stable family life with a capable parent or parents, the judge correctly found the record demonstrated that reunification was not a viable option because Phil could not be a responsible parent within any foreseeable reasonable time and that the resource parents would be able to mitigate any harm caused by his removal from Phil's life.

Accordingly, there was clear and convincing evidence to support the judge's finding the Division proved prong four that terminating Phil's parental rights with Jordan would not do more harm than good.

13

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office

CLERK OF THE APPELLATE DIVISION

14

A-3488-22