**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0029-19T2

STEFANOS PANTAGIS,

    Plaintiff-Appellant,

v.

ATHENA LANTZ,

    Defendant-Respondent.

_____

Submitted December 14, 2020 – Decided  January 29, 2021

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1540-10.

Herbert & Weiss, LLP, attorneys for appellant (Helene C. Herbert, Helayne M. Weiss and Lori E. Kolin, on the briefs).

Ziegler, Zemsky & Resnick, attorneys for respondent (Ashley Vallillo Manzi, of counsel and on the brief).

PER CURIAM

In this post-judgment matrimonial matter, plaintiff/father appeals from portions of May 2, June 26 and July 17, 2019 Family Part orders pertaining to enforcement of provisions of a consent order, appointment of a law guardian for the parties' son, and participation in a family reunification program for alienated children. For the reasons that follow, we affirm.

Plaintiff and defendant/mother divorced in 2013 after a sixteen-year marriage that produced two children, a daughter, M.P.,[1] born July 1999, and a son, G.P., born May 2003. The dual judgment of divorce, which was entered following a lengthy trial with multiple psychological experts, among other things, awarded the parties joint legal custody of the children, with defendant designated the parent of primary residence and plaintiff allowed to move from supervised to unsupervised parenting time. The trial judge noted that while the custody expert found no parental alienation at the time of the divorce, there were "several significant indicators of [parental alienation]" evidenced by "the [c]hildren see[ing] . . . [p]laintiff in a totally negative way and . . . [d]efendant in a totally positive way." As a result, the divorce judgment incorporated a defined parenting time plan, and the parties, both physicians, were ordered to engage in family therapy.

---

[1] We use initials to protect the confidentiality of the children. R. 1:38-3(d)(3).

A-0029-19T2

Both parties appealed the divorce judgment, resulting in an unpublished decision affirming, in part, and remanding certain financial issues for further proceedings. See Pantagis v. Lantz-Pantagis, No. A-6016-12 (App. Div. Feb. 4, 2016) (slip op. at 11-12). The decision noted that "the entitlement, if any, to appellate counsel fees shall be considered in the first instance by the trial court on remand." Id. at 12. During the remand, after two years of post-judgment motion practice and extensive mediation, on March 2, 2018, the parties entered into a consent order containing forty-nine provisions. In addition to the financial issues that were the subject of the remand, the consent order included an exhaustive parenting time plan and provisions pertaining to counsel fees and reconciliation therapy as well as other issues unrelated to this appeal.

The counsel fee provision stated:

> . . . Both parties hereby waive any and all rights to counsel fees associated with their [a]ppeal and [c]ross-[a]ppeal. Plaintiff made the application for counsel fees in his [c]ross-[a]ppeal. These waivers are permanent and irrevocable.
>
> . . . Both parties hereby waive any and all rights to counsel fees associated with post judgment litigation currently in existence, including trial court and [a]ppellate [d]ivision fees through February 28, 2018. These waivers are permanent and irrevocable.

Regarding reconciliation therapy, the consent order provided:

A-0029-19T2

. . . The parties agree to utilize Dr. Justin Misurell for reconciliation therapy with [G.P.]. The parties agree to cooperate with one another and any professionals, including Dr. Misurell, to facilitate [G.P.]'s relationship with [plaintiff]. It is anticipated that Dr. Misurell wishes to meet with each parent, and each parent agrees to do so. It is anticipated that Dr. Misurell will he seeing [G.P.] once per week, and [defendant] shall facilitate [G.P.]'s attendance at same. The first appointment is scheduled for Wednesday, February 28, 2018, at 4:30 p.m. The parties agree and consent to Dr. Misurell speaking with all professionals associated with [G.P.]'s care[] and education. In the event that [G.P.] overcomes his issue of getting into a car with [plaintiff], then the parties agree that when there is a joint session with [plaintiff] and [G.P.], [plaintiff] shall pick up at [defendant's] home and bring [G.P.] to the joint session. [Plaintiff] to drop off at [defendant's] home.

. . . It is [plaintiff's] position that if [r]econciliation [t]herapy is unsuccessful as of June 2018, [G.P.] and [plaintiff] should attend a week long workshop for families affected by parental alienation, such as Family Bridges or Overcoming Barriers Family Camp. It is [defendant's] position that there has been no parental alienation and no such camp is necessary.

About a year later, on or about March 4, 2019, plaintiff moved to enforce litigant's rights and to set aside certain provisions of the March 2, 2018 consent order under Rule 4:50-1. Pertinent to this appeal, plaintiff sought to vacate the provisions of the consent order "regarding [his] waiver of counsel fees on appeal, the post judgment legal fees, and mediation costs" due to defendant's

purported "false pretenses and misrepresentations . . . before the mediator, the [c]ourt[,] and [p]laintiff." Plaintiff also asserted that defendant violated litigant's rights by failing to comply with the consent order and sought an arrest warrant for "her non-compliance and obstruction of [his] joint custody and parenting time."

In support of his motion, among other things, plaintiff claimed defendant failed to "ensure [G.P. was] brought to reunification therapy with Dr. Misurell." In his accompanying certification, plaintiff averred that:

> Despite [d]efendant's representations to comply and participate in therapy, I had only six father son reunification sessions with Dr. Misurell. The therapy was necessary due to [d]efendant's years of parental alienation and pathological lies she told our children[] and the court. In a follow-up session Dr. Misurell advised me [d]efendant stopped bringing [G.P.] to therapy . . . I had discussed with Dr. Misurell filing a motion regarding [d]efendant's [o]bstruction and her refusal to bring [G.P.] to therapy. However, Dr. Misurell suggested I wait[,] and I did. Dr. Misurell's request not to file an application with the [c]ourt to enforce therapy or parenting time was based on his concern it would "escalate tensions between [G.P.], his mother, and his parents and would thus undermine any chance of the therapeutic process succeeding." . . . . That is clearly not [d]efendant's intentions as she continued the litigation and bitter fight at the ultimate expense of our children not having a relationship with their father.

A-0029-19T2

According to plaintiff, as a result of defendant's continued recalcitrance, Dr. Misurell ultimately suspended treatment and notified the parties in an October 18, 2018 email, stating:

> I regret to inform you that in light of [G.P.] and [defendant's] inconsistent attendance and lack of participation in therapy I have decided to suspend treatment and cancel the standing appointment. I have only seen him twice since June 20, 2018. I fear at this point continuing with therapy in this way will be counterproductive. I will be sending you a treatment summary letter containing my recommendations for the next steps. I wish you well with the process.

The October 18, 2018 treatment summary letter provided by Dr. Misurell reported:

> [G.P.] and his parents attended [twenty-five] therapy sessions. Of those sessions, [G.P.] attended [fourteen]. However, only six of those sessions included [G.P.] and his father together, which was woefully inadequate. [Plaintiff] attended nine sessions individually and six sessions with [G.P.].[2] Throughout the therapeutic process [plaintiff] presented as highly invested and engaged in the therapeutic process[] and was respectful and accommodating to both this clinician and to [G.P.]
> . . . .
>
> Although [defendant] was present at a number of our sessions and reportedly encouraged [G.P.] to attend, her

---

[2] Dr. Misurell also reported that defendant "attend[ed] two sessions over the summer . . . without [G.P.] present[,]" during which "she discussed ways in which the relationship between [G.P.] and his father could be improved and strategies for encouraging [G.P.] to attend therapy."

6

A-0029-19T2

participation in and support of the reunification therapy process could have been stronger. For one, [defendant] could have taken steps to ensure that [G.P.] is complying with his parenting time and therapy obligations. Secondly, in the event of session cancellations, [defendant] could have assisted in rescheduling therapy to another day and time so as not to lose clinical momentum. Thirdly, [defendant] and [plaintiff] could have worked together as a team to improve [G.P.]'s relational problems. While [plaintiff] was receptive to meeting with [defendant] in the context of therapy, she was not and would not agree to working together with [G.P.]'s father. It is likely that [defendant's] lack of full participation in the process contributed to the lack of therapeutic success.

As a result of [G.P.]'s and [defendant's] lack of sufficient support and participation in the reunification therapy process, a determination was made to suspend treatment. . . . It is likely that [G.P.] and his father may need a higher level of intervention in order to address the relationship difficulties and the alienation dynamics present in this case. For instance, they may benefit from Family Bridges. This program is considered the gold standard in treating parent child alienation related difficulties and is . . . intensive and immersive. It is only recommended in cases in which outpatient therapy has not been successful after repeated attempts.

Defendant opposed plaintiff's motion and cross-moved for enforcement of other provisions of the consent order unrelated to the issues germane to this appeal. In her accompanying certification, defendant denied plaintiff's allegations of non-compliance and fraud and alleged that his "motion [was] retaliation for the ethics grievance she [had] filed against [his] attorney, who

[was] also his wife."[3]  Defendant explained that when she received Dr. Misurell's October 18, 2018 letter, she "was surprised" as she "had no idea that he intended to stop therapy.  In fact, [she] immediately responded questioning why he had unilaterally done so without warning to [her] or [G.P.]."[4]  However, while she believed that "[a]t this juncture, it [was] unrealistic to expect [G.P.] to resume weekly therapy with [p]laintiff and Dr. Misurell simply from a scheduling standpoint," she asserted she would "not interfere with or object to continuing with reunification therapy" "[t]o the extent Dr. Misurell has availability that will coincide with [G.P.]'s availability."

Defendant further asserted that "while [she] remain[ed] committed to assisting [G.P.] build his relationship with his father," whenever she "tell[s] [G.P.] he has to go to therapy or he has to see his father, he retaliates against [her]."  Moreover, notwithstanding plaintiff's allegations to the contrary, according to defendant, "[the children] have dinner with [p]laintiff nearly every Saturday and Sunday.  They refer to their dinners with [p]laintiff as 'Athena

---

[3]  Defendant had previously moved in the Appellate Division to disqualify plaintiff's attorney pursuant to RPC 3.7, which motion was denied by order dated July 10, 2014.

[4]  Defendant believed that "Dr. Misurell was always partial to [p]laintiff" as "[h]is participation in [their] matter commenced as [p]laintiff's expert."

A-0029-19T2

bashing sessions,' because according to them, [p]laintiff utilizes his time with the children to disparage [her]." Nonetheless, defendant "continue[d] to encourage the children to spend time with their father and they continue[d] to do so." In a reply certification, plaintiff refuted defendant's allegations but agreed that reunification therapy with Dr. Misurell should be resumed.

During oral argument conducted on April 26, 2019, after establishing that G.P. was having "biweekly visits with [plaintiff]," the judge rejected plaintiff's claim that defendant was "not allowing any contact" between plaintiff and G.P. as "simply not true." Likewise, the judge rejected plaintiff's contention that defendant was not cooperating with reunification therapy based on the record of "at least twenty[-]five sessions" with Dr. Misurell. The judge therefore determined that plaintiff failed to "establish[] . . . complete fraud" or "deception . . . to the level to vacate" the counsel fee waiver provisions of the consent order and denied plaintiff's Rule 4:50-1 motion, stating:

> In terms of your motion . . . to vacate the consent order, you indicated that it was completely based on fraud, that once [defendant] got money,[5] she was basically going to walk away, and not comply. I disagree.

---

[5] The judge was referring to plaintiff's claim that once defendant obtained the benefit of the financial terms in the consent order, specifically the quitclaim deed for the former marital residence and funds from pre-marital asset accounts, she stopped cooperating with the other provisions of the consent order.

> The record does not support that [defendant has] done absolutely nothing to comply and that there was fraud.

However, the judge found that despite the protracted history of litigation between the parties, neither "party ha[d] sufficiently protected the interest of" G.P. As a result, the judge appointed "an attorney" pursuant to Rule 5:8A to provide G.P. "a voice." Acknowledging the differing roles, the judge stressed that she was not "appoint[ing] . . . a guardian ad litem [(GAL)]," "but an attorney" to serve as "an advocate" for G.P. The judge also ordered participation in the Family Bridges program, as recommended by Dr. Misurell, and continued therapy with Dr. Misurell in the interim with defendant ensuring G.P.'s attendance. Plaintiff's counsel advised the judge that the Family Bridges program required certain orders from the court for participation and offered to send a proposed order for the court's approval. The judge memorialized her decision in a May 2, 2019 order, which appointed Michael Spinato, Esq. to represent G.P. and included a June 6, 2019 return date for a case management conference (CMC).

On May 22, 2019, plaintiff moved for reconsideration of the May 2, 2019 order. In a supporting certification, plaintiff reiterated the allegations of defendant's obstruction and lack of cooperation with his parenting time and

10

G.P.'s reunification therapy. Plaintiff sought "a finding of parental alienation for [d]efendant's actions" and a "temporary" award of "custody of [G.P.] while attending the Family Bridges program." Plaintiff also sought reconsideration of "the appointment of a law guardian for [G.P.,]" asserting that it would "be futile because [G.P.] has been indoctrinated to view [him] negatively."

On June 11, 2019, defendant opposed plaintiff's motion and cross-moved to modify the May 2, 2019 order to reflect that, given G.P.'s "anxiety regarding the . . . program," G.P. not be compelled to attend the Family Bridges program until the court has heard from G.P.'s appointed attorney. Defendant also requested counsel fees and costs associated with filing the application, pointing out that "[p]laintiff does not incur counsel fees and effectively uses his current wife to drag [plaintiff] through the legal system." Defendant further asserted that plaintiff's "allegations of alienation [were] baseless," inasmuch as plaintiff "sees [their] children weekly, oftentimes having more quality time with them than [she does] on a weekend."

Additionally, defendant urged the court to appoint a new reunification therapist to replace Dr. Misurell. In her supporting certification, defendant characterized Dr. Misurell as "nothing more than [p]laintiff's mouthpiece," who was not working in "[G.P.]'s best interest, but rather working toward helping

[p]laintiff sabotage [her]." To support her contention, defendant recounted the following exchanges between herself and Dr. Misurell concerning scheduling G.P.'s appointments:

> a. On April 29th, Dr. Misurell sent [p]laintiff and me an email regarding his first available appointment on Sunday []May 5th[]. . . .
>
> b. On April 29th, I wrote back, explaining that May 5th was [G.P.]'s birthday, and he was having a birthday party with his friends that day. . . . However, I said to Dr. Misurell, . . . . May 8, Wednesday is free after school. Let me know what time on Wednesday works for you. . . .
>
> c. On April 30th, Dr. Misurell indicated he did not have any Wednesday availability and asked if there were any other days after school available. . . .
>
> d. On April 30th, I wrote back, asking Dr. Misurell how late his sessions could be scheduled. . . .
>
> e. On April 30th, Dr. Misurell provided us with his office hours. . . .
>
> f. On May lst, I wrote Wednesdays will continue to be the preferable day for the long run. However, in the interest of getting started Thursday at 6[:]30 pm might work in the interim. . . .
>
> g. On May 1st, Dr. Misurell indicated his only available appointment was Sunday at noon, but he would keep us posted on available times and put us on a waitlist for a standing appointment on Wednesdays. . . .

h. On May 14th at noon, Dr. Misurell indicated he had a cancellation for the following day (Wednesday) at 4:30pm. . . .

i. On May 14th, I responded less than two hours later, explaining that it was my 50th birthday and I had plans to be in New York City, so I could not make it. . . .

j. On May 14th, Dr. Misurell indicated he had availability on Thursday at 5:30pm. . . .

k. On May 14th, I responded, indicating that [G.P.] has his tutor until 5:30pm. I asked again if we could do Thursday at 6:30pm. . . .

Defendant related another instance when she had to cancel a session unexpectedly upon learning from G.P. "for the first time" that "he was required to stay after school to study for [a final exam]." Defendant explained that although Dr. Misurell "blames her" for the cancellations, "[w]hat he does not understand is that [G.P.] is a teenager" who "makes his own schedule, and oftentimes, [she is] the last to learn about his plans." Defendant stated that notwithstanding the scheduling issues, "since the entry of the [May 2, 2019 o]rder, [G.P.] saw Dr. Misurell on May 21st and June 5th." However,

> when [G.P.] came out from the [May 21st] session, he lashed out at [her], telling [her] it was all [her] fault that he had to return to Dr. Misurell. He was very upset, telling [her] that Dr. Misurell told him there was going to be another lawyer involved in the case. He had a complete meltdown, and [she] had to be the one to pick up the pieces.

13

On June 26, 2019, following oral argument, the judge denied both motions, explaining that neither party provided a basis for reconsideration pursuant to court rule, see R. 4:49-2, or caselaw. See Fusco v. Bd. of Educ. of Newark, 349 N.J. Super. 455, 462 (App. Div. 2002) (explaining reconsideration is only available when "either ([1]) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990))).

As to reconsidering the denial of the Rule 4:50-1 motion, the judge stated that mere "disagree[ment]" with the decision "does [not] mean that it was incorrect." The judge then reiterated that plaintiff failed to meet the Rule 4:50-1 standard because there was no "mistake[,]" "no surprise[,]" "no newly-discovered evidence," and "no fraud established in any way." Turning to plaintiff's request to reconsider the appointment of Spinato to serve as G.P.'s law guardian, the judge reiterated her "concerns as to whether either parent at this time [was] protecting the interests of their child" and expressed the "need to have independent counsel to do so." The judge pointed to the "absolutely contentious" litigation that had been ongoing since 2013 and lamented that "a

14

[sixteen]-year-old [was] stuck in the middle of all of this." The judge noted that the circumstances were exacerbated by the personal relationship between plaintiff and his attorney, specifically, the fact that they were married to each other and G.P. had reportedly made "very disparaging" comments about his stepmother.

To that point, addressing plaintiff's attorney, who was also G.P.'s stepmother, the judge stated that in a prior certification, plaintiff had averred that the reason G.P. refused to come to plaintiff's home was because of his stepmother, about whom G.P. made several disparaging and pejorative remarks. The judge stated:

> [T]hat . . . gives me pause . . . .
>
> [Y]ou are in a very difficult position right now and I want to make sure that the child's best interests are protected. And I am not accusing [plaintiff] of anything. What I'm saying is I need to have someone advocate for the child.

The judge reiterated the "different functions" of a GAL and a law guardian and confirmed that G.P. "need[ed] legal representation, because the parents [were] completely at odds" and the judge was "not convinced that either [parent]" or "the attorneys" representing them had "the child['s] best interests at heart."

A-0029-19T2

In a memorializing order dated June 26, 2019, the judge scheduled a CMC for July 23, 2019, to allow Spinato time to familiarize himself with the matter in order to advance G.P.'s position. While the judge directed the parties to resume therapy with Dr. Misurell and attend the Family Bridges program in the interim, the judge refused to sign the proposed order submitted by plaintiff for participation in the program because it included a "judicial determination" of parental alienation that had not been made by the court. The following day, June 27, 2019, plaintiff's attorney submitted a revised proposed order to the court and counsel for G.P.'s attendance at the Family Bridges program. Among the twenty-five provisions in the order, the order specified that plaintiff would have "sole legal and residential custody" of G.P. "while engaged in [the program]" and would have "authority to make all decisions regarding [G.P.'s] welfare without consultation." Both defendant and the law guardian submitted written objections to the proposed order.

As a result, the judge conducted a CMC on July 17, instead of July 23, 2019, to address the proposed order and the objections. At the conference, plaintiff's counsel advised that she had contacted the Family Bridges program and was told that they required a specific order to commence the program. Upon finding that the proposed order contained "legal determinations" that had never

16

been made by the court and modified "some of the provisions that have previously been agreed upon by the parties by awarding [plaintiff] sole legal and residential custody of the child," the judge again refused to sign the order.

At the conference, in addition to objecting to the proposed order, Spinato, as G.P.'s law guardian, requested that the judge "terminate th[e] litigation" and relieve G.P. of all obligations "to attend any therapy for reunification." According to Spinato,

> [G.P.] does not want to reconnect. And one of the things that he would tell you is my father doesn't understand me. I asked him specifically about the alienation . . . . And [G.P.] would tell this [c]ourt through me that his mother does not alienate him or has not taken steps to alienate him. That's what he says.
>
> He will tell you . . . that mom doesn't speak ill of his father, but he feels vice-versa, that his dad speaks ill of his mother, which drives him . . . further away from his father.

Spinato explained that when G.P. told him that he recalled the acrimony between his parents from the time that he "was in diapers," "it reverberated through [Spinato's] head that this young . . . man was dealing with this for . . . the last eleven, twelve years." Spinato implored that "[i]t's got to end for him, for his sake, for his benefit, for his best interest. It has to end." Spinato acknowledged that there was no motion pending before the court to effectuate

17

G.P.'s wishes but expressed his intention to file the appropriate motion on G.P.'s behalf.

The judge expressed sympathy for G.P.'s position, but agreed that "the litigation ha[d] to continue" as "there [was] no motion pending before th[e c]ourt indicating otherwise." After confirming with both parties that reunification therapy with Dr. Misurell "ha[d] been going well," the judge ordered the continuation of reunification therapy with Dr. Misurell and noted that "as long as there [was] continued compliance, there [was] no need for [G.P.] to attend the Family Bridges program." Plaintiff's counsel therefore agreed to withdraw the request for attendance at the Family Bridges program given that the parties were in compliance with reunification therapy. The judge entered a corresponding order dated July 17, 2019, and this appeal followed.

On appeal, plaintiff[6] raises the following contentions for our consideration:[7]

> I: THE TRIAL COURT ABUSED ITS DISCRETION, MADE FINDINGS INCONSISTENT WITH OR

---

[6] Defendant has not cross-appealed any of the judge's decisions.

[7] In his reply brief, plaintiff raises a new argument requesting that we retain "original jurisdiction relating to the application of attorney fees." We decline to address the argument, as it is improper for a party to use a reply brief to raise an issue for the first time. Goldsmith v. Camden Cnty Surrogate's Office, 408 N.J. Super. 376, 388 (App. Div. 2009).

18

UNSUPPORTED BY COMPETENT EVIDENCE, AND FAILED TO CONSIDER THE CONTROLLING LEGAL PRINCIPLES IN FAILING TO FIND DEFENDANT IN VIOLATION OF LITIGANT'S RIGHTS.

II: THE JUDGE ERRED IN DENYING THE LIMITED RELIEF REQUESTED TO SET ASIDE SPECIFIC PROVISIONS OF THE CONSENT ORDER WHICH WOULD PERMIT PLAINTIFF THE OPPORTUNITY TO MAKE AN APPLICATION FOR COUNSEL FEES IN ACCORDANCE WITH THE PRIOR REMAND ORDER.

III. THE JUDGE ERRED IN APPOINTING A LAW GUARDIAN FOR THE CHILD AND DISREGARDED THE DISTINCTION BETWEEN THE APPOINTMENT OF AN ATTORNEY PURSUANT TO [RULE] 5:8A VERSUS [RULE] 5:8B.

Our review of orders entered by Family Part judges is generally deferential. Landers v. Landers, 444 N.J. Super. 315, 319 (App. Div. 2016) (citing Gnall v. Gnall, 222 N.J. 414, 428 (2015)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence" in the record. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We owe substantial deference to the Family Part's findings of facts "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Id. at 413. Thus, while we owe no special deference to the trial judge's

legal conclusions, <u>Manalapan Realty, L.P., v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995), we will

> "not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" or when we determine the court has palpably abused its discretion.
>
> [<u>Parish v. Parish</u>, 412 N.J. Super. 39, 47 (App. Div. 2010) (alteration in original) (quoting <u>Cesare</u>, 154 N.J. at 412).]

We also review a trial court's decision on a motion for reconsideration under an abuse of discretion standard. <u>Cummings v. Bahr</u>, 295 N.J. Super. 374, 389 (App. Div. 1996). Accordingly, "a trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." <u>Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment</u>, 440 N.J. Super. 378, 382 (App. Div. 2015) (citing <u>Hous. Auth. of Morristown v. Little</u>, 135 N.J. 274, 283 (1994)). A court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" <u>Ibid.</u> (quoting <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002)).

Likewise,

[a] motion under Rule 4:50-1 is addressed to the sound discretion of the trial court, which should be guided by equitable principles in determining whether relief should be granted or denied. The decision granting or denying an application to open a judgment will be left undisturbed unless it represents a clear abuse of discretion.

[Little, 135 N.J. at 283 (internal citations omitted).]

"Rule 4:50-1 provides for relief from a judgment in six enumerated circumstances," In re Estate of Schifftner, 385 N.J. Super. 37, 41 (App. Div. 2006), and "does not distinguish between consent judgments and those issued after trial." DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009). The Rule provides that

the court may relieve a party . . . from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under [Rule] 4:49; (c) fraud . . . , misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.

[R. 4:50-1.]

Importantly, Rule 4:50-1 does not provide "an opportunity for parties to a consent judgment to change their minds; nor is it a pathway to reopen litigation because a party either views his settlement as less advantageous than it had previously appeared, or rethinks the effectiveness of his original legal strategy." DEG, LLC, 198 N.J. at 261. "Rather, the rule is a carefully crafted vehicle intended to underscore the need for repose while achieving a just result." Ibid. Thus, "[o]nly the existence of one of [the six triggering events] will allow a party to challenge the substance of the judgment," id. at 261-62, and "[r]elief [under the rule] is granted sparingly." F.B. v. A.L.G., 176 N.J. 201, 207 (2003).

Guided by these deferential principles and our thorough review of the record, we discern no error in the determinations made by the judge to warrant our intervention and affirm substantially for the reasons stated in the judge's oral opinions. Plaintiff argues the judge erred in "disregard[ing] the history of parental alienation" and overlooking the best interest factors contained in N.J.S.A. 9:2-4 to "determin[e] the disputed parenting time issue[s]." See Terry v. Terry, 270 N.J. Super. 105, 107, 119 (App. Div. 1994) (reversing and remanding "portions of the original judgment pertinent to custody and visitation" because "the trial court failed to analyze the evidence presented at trial pursuant to the mandatory statutory considerations delineated in N.J.S.A.

9:2-4" as well as "the additional requirement that the court consider and articulate why its custody decision is deemed to be in the child's best interest"). However, plaintiff's arguments are misguided and misplaced because the judge neither modified custody nor parenting time. Indeed, during the April 26, 2019 oral argument, the judge explicitly stated she was "not changing any of the terms of the [agreed-upon] parenting time." Instead, the judge prudently appointed a law guardian to advocate for G.P., pursuant to Rule 5:8A.

Rule 5:8A provides that

> In all cases where custody or parenting time/visitation is an issue, the court may, on the application of either party or the child or children in a custody or parenting time/visitation dispute, or on its own motion, appoint counsel on behalf of the child or children. Counsel shall be an attorney licensed to practice in the courts of the State of New Jersey and shall serve as the child's lawyer. The appointment of counsel should occur when the trial court concludes that a child's best interest is not being sufficiently protected by the attorneys for the parties.

"A court-appointed counsel's services are to the child." Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 69 (App. Div. 2002) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 5:8A, 5:8B, www.gannlaw.com (2021)). "Counsel acts as an independent legal advocate for the best interests of the child and takes an active part in the hearing, ranging

from subpoenaing and cross-examining witnesses to appealing the decision, if warranted." Ibid. (quoting Pressler & Verniero, cmt. on R. 5:8A, 5:8B). In In re M.R., 135 N.J. 155, 173 (1994), our Supreme Court explained the difference between the role of a law guardian, pursuant to Rule 5:8A, and GAL, pursuant to Rule 5:8B, noting that appointment of a law guardian is "for legal advocacy" while a GAL's

> services are to the court on behalf of the child. The GAL acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child. The GAL submits a written report to the court and is available to testify. If the purpose of the appointment is for independent investigation and fact finding, then a GAL would be appointed.
>
> [Ibid. (quoting Pressler & Verniero, cmt. on R. 5:8A, 5:8B).]

"We made the same distinction in [In re] Adoption of a [C]hild by E.T.," where we stated "the basic role of a law guardian for . . . a minor is to 'zealously advocate the client's cause' whereas the basic role of a [GAL] is to assist the court in its determination of the . . . minor's best interest." Robert M., 347 N.J. Super. at 70 (App. Div. 2002) (quoting In re Adoption of a Child by E.T., 302 N.J. Super. 533, 539 (App. Div. 1997)). The decision to appoint either a GAL or a law guardian under the Rules is left to the "broad discretion" of the Family Part judge. Gyimoty v. Gyimoty, 319 N.J. Super. 544, 550 n.1 (Ch. Div. 1998).

Here, the judge clearly articulated her reasons for appointing a law guardian and repeatedly expressed a thorough understanding of the differing roles between a law guardian and a GAL. Given the circumstances in the case, we discern no abuse of discretion in the judge's appointment of a law guardian to advocate for G.P., and we conclude plaintiff's contrary arguments are uniformly without merit. A Family Part

> judge entrusted with these difficult and often heart-rendering decisions must be advised of a child's wishes if justice is to be done. Law guardians are obliged to make the wishes of their clients known, to make recommendations as to how a child client's desires may best be accomplished, to express any concerns regarding the child's safety or well-being and in a proper case to suggest the appointment of a guardian ad litem.
>
> [Robert M., 347 N.J. Super. at 70.]

That is exactly what occurred here.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0029-19T2