# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3089-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.M. and M.O.,

     Defendants,

and

E.G.,

     Defendant-Appellant.

_____

IN THE MATTER OF M.O., S.G.,
and G.O., minors.

_____

Submitted September 23, 2025 – Decided October 14, 2025

Before Judges Chase and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0150-20.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Kathleen A. Gallagher, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Michelle J. McBrian, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor G.O. (Meredith A. Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, Designated Counsel, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor M.O. (Meredith A. Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

E.G. ("Ed"), appeals from an order entered by the Family Part on June 13, 2023, which found that he had sexually abused his stepdaughters, M.O. ("Mary"), and G.O. ("Gina") and abused or neglected his biological child, S.G. ("Susie"),[1] by placing her at a substantial risk of harm. Because the family

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to

court's findings are supported by substantial, credible evidence and because its legal conclusions are consistent with well-established law, we affirm.

## I.

Ed is the stepfather of Mary, and Gina, born in 2007 and 2009 respectively; and the biological father of Susie, born in 2016. D.M. ("Donna") is the mother of all three children.[2] Ed and Donna were married, and Ed had been living in Donna's home since 2013.

Starting in 2010, the Division of Child Protection and Permanency ("DCPP") received numerous Child Protective Services ("CPS") referrals alleging medical neglect, physical abuse, substance abuse, failure to supervise, and domestic violence. Each referral from January 2010 until 2017 was either unfounded or not established; the cases were closed at intake and services were not implemented.

In May 2018, Mary reported to school staff that she felt unsafe at home due to Donna's continued threat of physical abuse, and that Donna "shows no love to her at all." Mary's school contacted DCPP, who conducted an assessment

---

Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

[2] Donna is not a part of this appeal.

and opened the matter to provide services to the family. DCPP recommended that Mary and Donna complete psychological evaluations. Donna refused to be evaluated. Mary completed her psychological evaluation and a psychiatric evaluation was recommended. Soon after, Donna allowed Mary to go live with her paternal aunt ("Lucy"). In May 2019, DCPP deemed the issues with the family resolved. Two months later, Mary returned home.

In October 2019, Mary, now twelve years old, reported to a school resource officer ("SRO") that Ed had been sexually abusing her since the age of nine, but that no one had believed her. Specifically, Mary stated that the previous night she had been watching Gina and Susie while Ed and Donna went out. When she woke up that morning, Ed was still under the influence from drinking alcohol the night before and touched her. Mary was then transported to the Union City Police Department, who referred the matter to DCPP and the Hudson County Prosecutor's Office ("HCPO"). Mary was transported to the HCPO Special Victims Unit ("SVU")—Donna was transported in a separate vehicle because Mary did not want to travel in the same car with her.

Mary was interviewed by an SVU detective, and she told the detective that she was concerned that Donna did not believe Ed physically touched or raped

A-3089-23

her. When the detective asked Mary to describe the first incident (the "skirt incident"), she answered:

> [T]hat she and [Ed] were watching a movie together and he had locked the door. She stated that he put his hand up her skirt and she walked away from him. She came out of the room with her skirt up and her mother asked her why.
>
> She recalled that at the time, she was nine years old and in the fourth grade, and she recalled that it was cold outside. She stated it occurred in her mom and [Ed]'s bedroom and her mom was in another room. She stated it was a nightmare. He started touching her breasts. She didn't like it and she left the bedroom.

Mary then described another incident (the "YouTube incident") that occurred when she was nine years old:

> [Ed] touched her everywhere, including her breasts, waist, and buttocks, which she described as "ass". She stated he was drunk and he tried to get out of -- and she tried to get out of the bedroom but the door was closed. Her mom was not home and she stated that he raped her by putting his thing in her. She stated that when he was done, he fell asleep.
>
> . . . .
>
> She stated at the time, they were watching YouTube and had fallen asleep on the bed when he came in, held her down, touched her breasts and every single part while taking her clothes off. She took a shower after because she felt dirty and nasty. She didn't see his body parts because he had a blanket over him.

A-3089-23

When asked to demonstrate what rape was with the dolls, Mary was unable to do so. Mary stated that after the skirt incident, she did not feel Donna would believe her since Ed had denied the incident upon Donna confronting him about it at the time.

Mary reported that an additional incident of sexual abuse took place the weekend before, when she returned home from grocery shopping with Donna. Ed asked Mary to go to his bedroom, and he touched her breast. Mary stated she pushed Ed's hand away because she knew it was wrong for him to touch her.

Mary then provided more context to the events that occurred that morning, stating she did not want to go to school that day. Then, Ed came into the bathroom while she was doing her hair and touched her and whispered "I don't want you to go to school, and you don't have to." Mary said Ed then touched her breasts. Following this, she left the bathroom, went to her bedroom, and wanted to immediately leave for school, but her mother said it was too early.

Mary also reported that drugs and alcohol were not issues in the home, and that she had never witnessed Ed and Donna in a physical fight with each other. Mary denied being physically disciplined and stated that Donna would discipline her by taking away electronics and prohibiting her from speaking to her friends. Mary reported that she started cutting herself that year, and stated

A-3089-23

she wanted to do so. The DCPP worker observed a small scratch on one of Mary's forearms.

Gina was also interviewed and denied feeling unsafe around Ed. She stated that no one had ever touched her inappropriately, and if they did, she would tell Donna "immediately." Gina also stated she did not know that Mary was inappropriately touched, denied being physically disciplined, and that no domestic violence occurred in the home. Susie, three years old at the time, "was observed to be the right height and weight for her age. She had no appearance of marks or bruises that were observed." Ed refused to speak with detectives or DCPP and instead wanted legal counsel.

Donna's interview with an SVU detective, in summary, evidences that: she and Mary did not have a great relationship; Mary had behavioral problems; Donna disciplined her kids by taking away their phones; Ed spoke to Mary about "not wanting her to be a street girl"; Ed and Mary had a good relationship and respected each other; Donna did not believe Ed sexually abused Mary because Mary had never told her that; the importance of reporting sexual abuse and how to stay safe were discussed in the home; and she did not believe Ed could sexually abuse Mary and "if he did do this, [she] would kill him."

A safety protection plan ("SPP") was put into place and signed by all parties; the SPP required Ed to leave the family home. After DCPP filed a verified complaint for protective services, the court granted DCPP care and supervision with restraints. A hearing was held in December. Donna and Ed appeared with counsel and did not challenge the continuation of the restraints or DCPP's care and supervision. The restraints prohibited Ed from any contact with Mary and only supervised visits with Gina and Susie.

DCPP referred Gina and Mary to Audrey Hepburn Children's House ("AHCH") for medical and psychosocial evaluations "to assess social and emotional functioning relative to the above concerns [the sexual abuse allegations], as well as to make relevant recommendations for [their] well-being." Mary cooperated with the medical evaluation, but "had poor eye contact, and was staring at the ground and became non-verbal." Mary reported having nightmares, and refused the anogenital evaluation, as such, it was deferred. Mary and Gina had psychosocial evaluations at AHCH at the end of December.

AHCH also conducted a collateral interview with Donna. Donna said she felt Mary "was confused" when she alleged Ed touched her inappropriately. Additionally, a collateral interview was also conducted with DCPP caseworker Kelly Haack-Ortiz. Haack-Ortiz opined that Mary's SVU interview was "bad"

A-3089-23

and had "several 'inconsistencies,'" however, Haack-Ortiz did not state what the inconsistencies were. Further, Haack-Ortiz averred that Ed was cooperating with DCPP and the authorities, had completed all of his interviews, and passed a polygraph test.

As to Mary, AHCH found the allegation of sexual abuse, and psychological maltreatment, perpetrated by Ed, was clinically supported. AHCH did not support the finding of child maltreatment as to Gina, who at that time did not allege any abuse, but recommended that Gina receive individual and family therapy, along with neuropsychological testing for a cognitive assessment of her strengths and weaknesses.

AHCH recommended Mary "participate in trauma-informed evidence based individual therapy," and "psychoeducation regarding body safety, appropriate touching and boundaries," along with treatment to address her coping skills, anxiety, and depression.

Over the next couple of months, case management conferences were held. In April 2020, Mary recanted her sexual abuse allegations against Ed. At the end of August, DCPP received another referral alleging Donna had forced Mary to recant her allegations of sexual abuse against Ed; at this time Gina also alleged sexual abuse by Ed. It was also reported that Donna and Ed were

9

violating the court order and SPP because Ed was residing in the family home. At the time of the referral, Mary and Gina were staying with Lucy.

DCPP immediately responded and interviewed Gina and Mary. Gina alleged she had not disclosed the sexual abuse previously because she feared her mother. Gina reported that, when she was ten years old, Ed tried to unbutton her shirt when he was drunk. Gina reported a different incident when Ed tried to put his hands down her pants when she was watching television. Gina also claimed that, when she was seven or eight, Ed touched her chest and waist over her clothes.

After the interviews concluded, the DCPP worker traveled to Donna's apartment and arrived around one in the morning. The worker found Susie was awake and walking around with a tablet. When asked who else was in the apartment, Susie replied "my dad." The worker searched the apartment but did not find Ed there. Donna had worked that day and the DCPP worker was dissatisfied with the information Donna provided about the child-care arrangements she had made for Susie while working. As a result, DCPP executed an emergency removal of Mary, Gina, and Susie.

Donna was interviewed by HCPO and expressed that she was not violating the court order that restricted Ed from living in the family home. Donna said it

was hard for her to believe Gina's allegations because Mary and Gina were never alone with Ed. Donna also expressed that Mary and Gina told her Ed never touched them. Donna admitted to the interviewing detective that Susie had been with Ed the previous day "because that's her dad."

About a month later, DCPP reinterviewed Gina and Mary. Gina alleged that Donna and Ed would drink on the weekends and claimed to have seen white powder around her mother's nose and mouth as well as around Ed's nose. Gina also alleged that Ed did not move out of the family home after being told to do so. Gina recalled incidents of domestic violence between Donna and Ed and an incident where Mary's "skirt was up from behind" and Donna questioned Mary about it. Gina reported that when Mary said Ed had touched her, Donna confronted Ed, but he denied it. Gina also stated that her mother and Ed physically disciplined her and her sisters.

The caseworker then spoke to Mary, who alleged Donna and Ed engaged in domestic violence that involved weapons, including knives. Mary recalled that the police had come to the home; however, Donna declined to file a case. Mary alleged she found a small packet of white power that she believed was cocaine in August or September 2019. Mary also reported seeing "white

powder" on Donna's nose, and being physically disciplined by her mother and Ed.

Mary then attended a second "Psychosocial Team Evaluation" at AHCH. Mary now reported that Ed touched her "with his hands and penis" and described being touched both under and over her clothes. Mary indicated no one else was present during the incident but stated her mother "saw that my shorts were half-way off." Mary reported that Donna did not believe her allegations. The evaluator noted Mary reported symptoms of post-traumatic stress, including sleep difficulties, somatic complaints, nightmares, anxiety, depression and self-injurious behaviors (cutting). The evaluator found clinical support for sexual abuse, psychological maltreatment, exposure to domestic violence and exposure to substance abuse.

Gina reported Ed would touch her "when he was drunk, which was every Friday[,]" then said Ed touched her inappropriately "pretty often . . . like every two weeks." Gina reported Ed touched her chest and vagina underneath her clothing with his hand, usually when Donna was not home and Mary was sleeping. Gina said that when not drunk, Ed would just touch her chest over her clothes, and she would run away. Gina and Mary reportedly discussed the abuse. Gina claimed that Donna told her to deny sexual abuse during her 2019

A-3089-23

evaluation with AHCH. As to Gina, the evaluator found clinical support for sexual abuse, physical abuse, exposure to domestic violence, exposure to substance abuse, and neglect.

In September 2021, Susie was reunified with Donna and Ed, and they were granted three hours per week of unsupervised time with her. In October 2021, Susie's visits with Ed were going well and DCPP requested that the court expand Ed's unsupervised time with Susie. In November 2021, Mary and Gina were reunified with Donna. Ed remained restricted from contact with Mary and Gina.

The fact-finding trial took place over several days in January, March, and April 2023. On the day trial was scheduled to begin, Donna waived her right to trial and entered a no-contest to DCPP's substantiated findings of abuse and neglect against her. At trial, DCPP caseworkers, Haack-Ortiz and Yudi Gonzalez ("Gonzalez"); Dr. Brett Biller, Psy.D.; and Mary testified. Ed did not offer any evidence or testimony.

Haack-Ortiz testified she was a DCPP caseworker for eighteen years and was assigned to investigate Mary's allegations of sexual abuse. Haack-Ortiz stated she went with Mary to the Union City Police Department and then to the HCPO's SVU interview, where she observed Mary's interview. Haack-Ortiz testified that Mary reported the skirt incident, the subsequent YouTube incident,

13

and that there were mental health concerns because Mary expressed her desire to cut herself. Haack-Ortiz stated that Mary's December 2019 AHCH evaluation clinically supported a finding of sexual abuse and was found to be consistent with what Mary had told the SRO, and the SVU detectives. Haack-Ortiz also stated at that time DCPP did not establish risk of harm to Gina or Susie.

Next, DCPP caseworker Gonzalez testified. Gonzalez stated she had been with DCPP for fifteen years and had been an intake worker for fourteen years. Gonzalez testified she became involved with the family in August 2020. Gonzalez testified that in August 2020, during a routine monthly visit at Lucy's home, a DCPP caseworker was informed that Donna had forced Mary to recant her sexual abuse disclosure, and that Gina had disclosed her own sexual abuse perpetrated by Ed. Further, it was reported that Ed had not moved out of the family home—in violation of the court order. Gonzalez averred that after the referral came in, she went to Lucy's home where Gina and Mary were staying, and that this occurred after five o'clock in the evening.

Gonzalez testified that HCPO's SVU was contacted, and soon after Gina, Mary, and Lucy were brought to SVU for interviews, which Gonzalez observed. Gonzalez observed Mary state to detectives that Donna had forced her to recant her earlier disclosure of sexual abuse and told Mary to say it was a dream that

14

did not actually occur. Gonzalez heard Mary telling the detective that Ed told her keep the abuse a secret, and that Ed still lived in the family home but would leave when they knew DCPP, the Law Guardian or others had planned visits.

As to Gina, Gonzalez testified that during the SVU interview, Gina indicated she was afraid to disclose the sexual abuse because she feared Donna. Gonzalez observed Gina tell the detective that, about a year prior, Ed was drunk and tried to "unbutton her shirt and put [his] hand in her pants," to which Gina "pushed him away," and ran from the bedroom—where the incident occurred— to the bathroom. Gina had told the detective that she disclosed the incident to Mary and Lucy. Gonzalez testified that after the interviews concluded, she went to the family home where she found Susie "wide awake," holding "a tablet in her hand walking around freely"; this occurred around one o'clock in the morning.

Gonzalez said she asked Susie if anyone else was home, and Susie answered "[m]y dad was home." Gonzalez stated that Donna allowed her to look around the home and that she did not see anyone else but did "see a lot of men's clothing in the closet and all throughout the apartment." When asked about the clothes Donna said they belonged to Ed. Further, Gonzalez said that Donna stated she believed Mary was making the allegations up, and that Gina had never

15

disclosed sexual abuse to her. When asked by Gonzalez who watched Susie that day, Donna answered a babysitter. Gonzalez then called the babysitter who stated she had not babysat Susie in two weeks and stopped babysitting Susie because Donna was no longer working. Donna attributed this to a misunderstanding, stating she thought Gonzalez was making a general inquiry as to who the babysitter was. Donna said it was her sister-in-law who watched Susie that day, which the sister-in-law denied.

Gonzalez testified that Ed and Donna were interviewed by SVU the next day, and that she observed Donna's interview. Gonzalez was present when Donna admitted to SVU that Susie had been alone with Ed the day prior while she was working. Gonzalez testified that DCPP substantiated Ed and Donna for abuse or neglect due to the clinically supported AHCH report finding sexual abuse, Mary and Gina's consistent disclosures, and because Donna had admitted to leaving Susie alone with Ed despite the court order.

Next, Dr. Biller from AHCH testified; all counsel stipulated his expertise and accepted him as an expert witness in psychology. Dr. Biller stated that when determining if sexual abuse is clinically supported, the team of evaluators look to the "background, the child's presentation of her circumstances," which in this

16

case involved "taking on a parentified role, disorganized attachments, and [Mary]'s statement of emotional response."

As to recantation, Dr. Biller testified that a recantation must be viewed in light of a lack of understanding, manipulation by an individual, and fear of not being supported. He stated that during Mary's first evaluation at AHCH Donna was her primary attachment, but it was a disorganized attachment, meaning that support and safety was uncertain. Dr. Biller stated Donna "would have been the greatest impact on recantation, and [Mary] did in fact recant." Dr. Biller then addressed Mary's reaffirmation of the abuse, stating that "disclosure of sexual abuse is a process. [Donna] continued not to support [Mary]. [Mary] had found greater comfort in [Lucy]'s home."

Dr. Biller also discussed Gina's disclosure, testifying that Gina made a spontaneous disclosure detailing the family's disfunction. Disclosing that Ed had touched her over her clothes when he was drunk, and that she was lying on the floor at the time, watching television, and taking care of Susie. Dr. Biller further stated that Gina failed to disclose this at her initial evaluation at AHCH because Donna did not support Mary when Mary disclosed her abuse. Dr. Biller testified that during her second evaluation at AHCH, Gina stated she had

disclosed the abuse when she was with Lucy and Mary, and that she feared Donna.

Dr. Biller stated that Mary and Gina's statements had "[g]eneral consistency, but maybe inconsistent or small differences in description." Dr. Biller also stated that Susie was not interviewed because they require the child to be at least four years old and able to communicate.

On cross-examination, Dr. Biller acknowledged he had no personal contact with Mary or Gina, and their team utilizes "a team evaluation and have done so for [twenty] years since 2003." Dr. Biller averred their approach involved a comprehensive health evaluation, including medical and mental health evaluations, evaluating "a child's sexual knowledge," and their discussions were "based on collaterals, training, and expertise." Dr. Biller stated the team looks at the "totality of the circumstances and the emotional impact."

Dr. Biller testified that variations of the same truth are common with disclosure of sexual abuse, but that a discrepancy would be a "factual impossibility." Dr. Biller stated:

> [I]nconsistencies are a normal part of disclosure and inconsistencies are different than what we would call discrepancies. So, inconsistencies are an example of what . . . [Mary] disclosed between her first interview and her second interview. In her first interview, [Mary] described touch. In her second interview, she

18

> confirmed what she had said during her prior disclosures to [DCPP] that there was penial vaginal penetration. . . . [T]hose may be inconsistencies because she's not providing all of the information, which we would expect. Children, when they disclose, provide parts of what they've experienced. They don't always provide all of that disclos[ure]. So, we consider that as a normal part of the disclosure process.

Dr. Biller further testified that "discrepancies are when information can't coexist together." Dr. Biller explained a discrepancy would be "if [Mary] reported that someone engaged her in inappropriate touch, but they didn't live in the country." Dr. Biller stated "[a]n inconsistency is just small differences in the information they present during each one of the clinical interviews."

Dr. Biller stated, "the team believed that neither child had a reason to fabricate," and that Mary and Gina "were consistent with what they understand for children who have had sexually inappropriate contact." Dr. Biller said that AHCH does not determine whether sexual abuse occurred or not, and noted traits of importance were "timid, anxious, suicidal, self-harming, betrayal by mother, [which] reaffirmed abuse." Dr. Biller also testified to reasons why sexual abuse would not be clinically supported, including the child's emotional presentation, and the totality of the background, which requires a case-by-case analysis.

Concerning Mary's brief recantation, this was made while Mary was again living with Donna. Dr. Biller testified this recantation was not a discrepancy,

but a result of the highly dysfunctional home environment, which included Ed remaining in the family home despite the court order prohibiting such, and Donna's lack of support. Dr. Biller stated that Mary was able to reaffirm the abuse once she was with Lucy, who created a safe environment for her.

The court also heard testimony from Mary, where she stated she had lived with Donna, that the relationship was distant, but okay, and confirmed she first disclosed the abuse in October 2019. Mary stated Donna was not happy about the disclosure, and at one point, Donna told Mary she must have liked it and called Mary a "s**t."

During questioning by the defense, Mary provided testimony regarding the skirt incident; where Ed put his hand up her skirt, and that he had raped her at one point when he was drunk. Mary stated she had told Donna about the skirt incident, but that Donna did not believe her, so Mary stopped telling her about the abuse. Mary further testified that in October 2019, Ed touched her breast before she left for school, and that after that she wanted to leave early for school, but Donna told her it was too early. Mary stated Gina had not disclosed her own abuse until they began talking about it at Lucy's home. She also testified that Ed was living in the home when he was not supposed to be.

A-3089-23

On June 13, 2023, the court issued a comprehensive oral opinion, finding DCPP established "by a preponderance of credible evidence" that Ed sexually abused Mary and Gina, in violation of N.J.S.A. 9:6-8.21(c)(3), and created a risk of abuse to Susie, in violation of N.J.S.A. 9:6-8.21(c)(4).

First, the court determined the credibility of the four witnesses. Specifically, the court found Haack-Ortiz to be credible and Gonzalez to be "fully credible." The court found Dr. Biller's testimony and conclusions to be "credible, factual, and well-supported." Finally, the court found Mary to be "completely credible," noting that she was not evasive, was clearly angry, and that there were moments when she became emotional but remained composed. The court also noted the documentary evidence presented to the court, which included the evaluations of Mary and Gina by AHCH, and DCPP's investigative reports supported its findings.

Regarding the proof that Ed sexually abused Mary and Gina, the court found that Mary reported the touching to her mother, school personnel, the police, the Division, AHCH, and then credibly before the court. Gina also reported allegations to several authorities. Donna and Ed admitted to violating court orders that had prohibited Ed from having contact with the girls or residing in the home.

The court noted that both girls provided "common, consistent descriptions of a highly dysfunctional home" that "led to an environment where sexual touching and sexual abuse transpired"—committed by Ed— "and was tolerated" by Donna—an enabler. The court "wholly rejected" defendant's arguments that the children's statements were inconsistent, and that AHCH's reports lacked credibility.

As to Susie, the court reasoned that risk of abuse was established because Ed sexually abused Mary and Gina in the home where Susie was present, and that Mary and Gina were "simultaneously acting as caretakers for [Susie] during some incidents of sexual abuse."

The court memorialized its findings in an order dated June 13, 2023. Thereafter, the court conducted compliance review hearings and entered an April 23, 2024 order terminating litigation. This appeal followed.

## II.

Our standard of review of the Family Part's fact-finding determination is circumscribed. See N.J. Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 112 (2011). We defer to the Family Court's factual findings, as long as they are supported by substantial credible evidence in the record. N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226 (2010); N.J. Div. of Youth & Fam. Servs.

22

v. M.M., 189 N.J. 261, 279 (2007).  We accord such deference "because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012).  However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made."  M.M., 189 N.J. at 279 (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). "Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review."  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)).  We also accord no deference to the trial court's legal conclusions, which we review de novo.  N.J. Div. of Child Prot. & Permanency v. V.E., 448 N.J. Super. 374, 384 (App. Div. 2017).

In Title Nine actions, through the admission of "competent, material[,] and relevant evidence," the Division must prove by a preponderance of the evidence that the child was abused or neglected.  N.J.S.A. 9:6-8.46(b); see also N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011).  N.J.S.A. 9:6-8.21(c), in pertinent part, defines an "abused or neglected child" as:  (3)

commits or allows to be committed an act of sexual abuse against the child; (4) a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care; and (4)(b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment.

Title Nine cases are fact sensitive, and the court should "base its findings on the totality of circumstances." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). Notably, the Title Nine proof standard is less stringent than in guardianship cases for the termination of parental rights, which instead must be proven by clear and convincing evidence. See R.D., 207 N.J. at 113.

The statute does not require that a child experience actual harm. N.J. Dep't of Child. & Fam. Servs. v. E.D.-O., 223 N.J. 166, 178 (2015). However, when a case lacks proof of actual harm "the critical focus is on evidence of imminent danger or substantial risk of harm." N.J. Dep't of Children & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013). In N.J. Div. of Child. Prot. & Permanency v. B.P., 257 N.J. 361, 376 (2024), our Supreme Court explained that the statute "does

not state that the mere possibility of the child being impaired is sufficient," but that "imminent means 'threatening to occur immediately; dangerously impending…[or] about to take place.'" Ibid. (quoting Black's Law Dictionary 898 (11th ed. 2019)).

Accordingly, "[t]he prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146-47 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (providing that under Title Nine, children's safety is "of paramount concern and the best interests of the child shall be a primary consideration"). "The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." V.T., 423 N.J. Super. at 328.

III.

On appeal, Ed begins by arguing that the trial court's finding of abuse or neglect is not supported by substantial credible evidence in the record and should be reversed. He argues the court and DCPP ignored fatal inconsistencies and discrepancies in Mary's and Gina's account of sexual abuse. We disagree. There was adequate, substantial, and credible evidence to support the finding

A-3089-23

that Ed sexually abused Mary and Gina and the court's factual findings were not so "wide of the mark," requiring this court to intervene.

Several witnesses testified during the fact-finding hearing, including Mary, two DCPP caseworkers, and Dr. Biller. All were subject to cross-examination. The court explained its credibility findings in great detail during a comprehensive oral decision, finding each of the aforementioned witnesses to be credible. The court further supported its decision by detailing several pieces of documentary evidence it considered.

Next, Ed argues that the trial court erred because it concluded Gina's allegations of sexual abuse were sufficiently corroborated to establish neglect and abuse. Ed contends that there was no direct or circumstantial evidence adduced to support the court's findings regarding Gina. We disagree.

N.J.S.A. 9:6-8.46(a)(4), authorizes, in Title Nine cases, the admission of "previous statements made by the child relating to any allegations of abuse" provided "no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." Corroborative evidence under this statutory hearsay exception may be circumstantial because there is often no direct physical or testimonial evidence to support a child's statements. New Jersey Div. of Youth and Family Services v. Z.P.R., 351 N.J. Super. 427, 436 (2002).

A-3089-23

Further, "[t]he corroborative evidence need not relate directly to the alleged abuser, it need only provide support for the out-of-court statements." Ibid. To accord "any real effect to the child victim hearsay statute, the corroboration must reasonably be held to include indirect evidence of abuse." Ibid. Evidence can include "a child victim's precocious knowledge of sexual activity, . . . a child's nightmares and psychological evidence." Ibid.

Here, Mary's testimony of the sexual abuse, which was found to be credible and "highly persuasive," corroborates Gina's abuse. N.J.S.A. 9:6-8.46(a)(1) states, "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian." Mary testified that she and Gina discussed the sexual abuse when they were staying with Lucy in August 2020. Mary also testified that Ed was still residing in the family home and had unsupervised access to Mary, Gina, and Susie, which Gina also stated during her evaluation at AHCH and to the DCPP caseworker.

Further, Mary's description of the abuse was similar to Gina's description. For example, Gina stated Ed touched her breast, attempted to unbutton her shirt, and then tried to put his hands down her pants. Mary had also stated that Ed would touch her breast and then put his hand on her waist and down her pants.

Gina also stated Ed was often drunk and the abuse would take place in his room; similarly, Mary also stated that Ed would be drunk during some instances of abuse.

Gina also stated she failed to disclose earlier because she feared Donna; Mary also testified, and stated several times while interviewed, that she failed to disclose the continued abuse because she was scared of Donna. Mary and Gina both stated that Donna made them lie about Ed residing in the family home.

The AHCH evaluations of Gina and testimony of Dr. Biller provided additional support for the court's findings that Gina was sexually abused and further corroborated Gina's statements. Despite Ed's assertions to the contrary, AHCH did not ignore discrepancies, and its conclusions were not based on uncorroborated statements of Gina. Instead, when determining if sexual abuse was clinically supported, the AHCH team focused on the child's behaviors, background information, the presentation of the description of abuse during the disclosure process, and the children's emotional responses to what they were experiencing. Additionally, Dr. Biller testified to Gina's delayed disclosure when she felt "safe" compared to when she was fearful of Donna.

Ed's additional argument, that the lack of physical exam by AHCH precludes a finding of sexual abuse, is without merit. As testified by Dr. Biller,

28

physical evidence of abuse is often not present and anogenital exams only will reveal injuries that have occurred in the last seventy-two hours. See Z.P.R., 351 N.J. at 436 (stating "physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses").

Ed also asserts that AHCH's reports and DCPP's expert ignored discrepancies in Mary's and Gina's statements and that AHCH's findings of "clinical support" are the evaluator's masked subjective opinions that Mary's and Gina's allegation are true. This argument is without merit. Dr. Biller did not make a conclusive finding that sexual abuse had occurred, but rather, that the allegations were "clinically supported" by the behaviors, symptoms, presentation and emotional responses of the children. Dr. Biller assisted the trier of fact in explaining: the differences between inconsistencies and discrepancies; victims delayed disclosure until they felt comfortable with their caregiver; and the psychological effects of being abused and in the presence of a parent who does not believe them.

IV.

Lastly, Ed argues there was insufficient evidence to support a risk of abuse as to Susie because the trial court failed to make specific findings of fact to

29

support its holding. Moreover, he argues that the risk of harm to Susie was not imminent. We disagree.

"Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999). "Absent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial risk of harm.'" B.P., 257 N.J. at 376, (quoting N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 22 (2013)). Additionally, a parent's conduct, as to one child, may be considered as creating a risk of harm to another child. N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010); see also N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002) (noting that the abuse of one child may pose a danger to other children in the household.)

In B.P., our Supreme Court summarized the basic elements of child abuse or neglect, holding: the Division must establish (1) that a child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired," . . . and (2) the "impairment or imminent impairment results from the parent's failure to exercise a minimum degree of care." 257 N.J. at 375-76 (citations omitted).

Here, the trial court properly determined that Ed created a substantial risk of harm to Susie. Ed's continued presence in the home despite court orders, his sexual abuse of Mary and Gina while Susie was in the home, and his sexual abuse of Gina in the presence of Susie—while Gina acted as Susie's caretaker and Ed was intoxicated—undoubtedly posed a substantial risk of harm to Susie.

To the extent we have not specifically addressed any other contentions raised by defendants, they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division